**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | **Civil Action No: 1:17-CV-6583** |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHWESTERN UNIVERSITY, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff John Doe[1] ("John" or "Plaintiff"), by and through his undersigned attorneys,

files this Complaint and, in support thereof, alleges as follows:

## I.   NATURE OF THE ACTION

1.    This is an action for declaratory and injunctive relief and for damages arising out

of the actions taken by Defendant Northwestern University ("Northwestern" or "the University")

and its agents concerning a false accusation of sexual assault and rape made against John, then a

student at Northwestern with an unblemished academic and disciplinary record, by his ex-

girlfriend, also a Northwestern student (referred to herein as "Jane Roe" or "Jane").

2.    The University's grievous mishandling of the accusation and its deeply flawed,

biased disciplinary process resulted in John's "exclusion," a severe punishment consisting of a

minimum two-year separation from the University, after which he will have to reapply for

---

[1]    Contemporaneously with the filing of this Complaint, Plaintiff has filed a Motion for Permission to Proceed Under Pseudonym.  As set forth in the Motion, Plaintiff is entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings against him that form the basis for his Complaint, and the fact that Northwestern is fully aware of his identity and will not be prejudiced in any way.  Plaintiff also seeks to maintain the privacy rights of his accuser by requesting permission to identify her anonymously as "Jane Roe."

admission subject to acceptance by the Office of Admission and approval from the Vice President of Student Affairs, with no guarantee of re-admission, and with a permanent disciplinary notation in his educational record.

3.      John and Jane Roe met through their participation in an extracurricular group ("the group") when John was a freshman and Jane was a sophomore. Their friendship became a sexually intimate, exclusive relationship early in the 2015 winter quarter.  At the time of the incident at issue, John and Jane were boyfriend and girlfriend.

4.      In the early morning hours of March 13, 2015, they engaged in a consensual sexual act, in which Jane clearly and voluntarily expressed consent to giving John oral sex through her words and actions. Within approximately one minute, Jane stopped giving oral sex and asked John if he was done. John realized she looked unhappy and the sexual activity ended without him climaxing.

5.      The two parted, and shortly thereafter began exchanging text messages, in which John, regretting having asked for sex, apologized for being selfish. Jane responded that he wasn't selfish, she wasn't angry with him, that it was a general issue of who enjoyed sex more, and they were "just different people." That evening, Jane texted John to invite him over ("Are you dropping by?") and hoped he would "feel better" when he said he could not join her because he wasn't feeling well.

6.      None of Jane's text messages remotely suggested that John had subjected her to forced or non-consensual sex.

7.      The two had an intense but difficult relationship. Jane, the upperclassman, would get angry with John for perceived slights having nothing to do with sex, and John, the freshman, found himself frequently apologizing and working hard to please her.

8.      Shortly after the March 13 incident, John spontaneously broke up with Jane after she made clear she did not value him as a boyfriend. It was a particularly hurtful breakup for Jane as she was used to being in charge in the relationship and John broke up with her at a party in front of their close circle of friends in the group.

9.      One month later, Jane texted John claiming that their "last time" having sex was "borderline sexual assault," an accusation John vehemently denied. Jane's accusation came amidst chatty text messages in which the two discussed Game of Thrones and other mundane topics.

10.      During the remainder of the spring semester, Jane texted John for his advice on her sometimes contentious relationships with other students (in which he reassured her things would be fine) and asked him for snacks and favors. When he texted her that he hoped they could return to being friends, she commented "Ahhh all the mistakes On both sides."

11.      When they both returned to campus for the fall 2015 semester, Jane suddenly texted John on September 22 stating that their consensual sexual activity on March 13 had been a "sexual assault." Yet again, this accusation came in the midst of texts in which Jane was pleasant and asked John for favors, including helping her with upcoming membership tryouts for the group. Jane told John they should not talk to others about what had happened between them.

12.      As the fall progressed, John began to realize that Jane, despite her stated wish for privacy, had been spreading false accusations about him to a broad range of friends, including members of the group, members of a religious community in which John participated, her sorority sisters, and John's fraternity brothers who socialized with the sorority sisters.

13.     As a result, John became increasingly isolated from his closest friends on campus. Then, at a football game, one of Jane's sorority sisters screamed curses at John, shouted that he was a "sexual assault perpetrator," and grabbed for his throat attempting to choke him.

14.     John reported the physical assault to Dr. Tara Sullivan, Director of the Office of Student Conduct and Deputy Title IX Coordinator, and sought her Office's protection from future harassment.  Instead of protection, Dr. Sullivan warned him that, if he filed a complaint against the sorority sister, her Office would open an investigation against *him* based on the sexual assault slur made by the sorority sister. She suggested that he go to the University's Counseling and Psychological Services if he felt he needed help.

15.     The final rift between Jane and John came when Jane, then co-president of the group, asked John to lie to a professor about being sick for class so that he could help her with the group's membership tryouts. She made it a quid pro quo, saying that, if he lied to his professor, she would "have a solution" for their "personal friendship" that she was "very willing to take." She offered to write the "lying letter" for him. He refused.

16.     Jane then texted John with an escalated accusation about the March 13, 2015 consensual sexual act – this time calling it "rape" – and demanded he take a leave of absence from the group. He consented to her demand while belatedly telling select friends how he was being falsely accused and unfairly treated.

17.     As news of Jane's demand and accusation spread through the group, student leaders reported the dispute to the group's faculty advisor who reported Jane's accusation to the Office of Student Conduct. The Office of Student Conduct asked Jane to make an official complaint.

18.     On January 4, 2016 – 10 months after the act at issue – Dr. Sullivan notified John that her Office had received a report of an incident alleged to have occurred on November 18, 2015 (not March 13) in which he may have violated unspecified policies in the Student Code of Conduct.  Consequently, John would need to go through a "process" to resolve the concern.

19.     When John met with Dr. Sullivan after her written notice, he learned for the first time that the University had charged him with sexual assault and sexual harassment.

20.     Dr. Sullivan still expressed no concern for the physical assault and harassment he had reported.

21.     Instead, she indirectly but clearly communicated to John that if he decided to file a complaint against the sorority sister, her Office would regard his complaint as "retaliation" against *Jane* for *her* complaint against him and would charge him with a "retaliation" violation, in addition to sexual assault and harassment.  Dr. Sullivan did so even though John had reported the physical assault *before* Jane's report, and therefore John's report could not have been "retaliation" for Jane's later report.

22.     This disparate treatment, which credited Jane's report, and discredited and deterred John's report as "retaliation," violated the University's contractual obligation to treat all parties involved in sexual misconduct proceedings fairly and impartially, and violated Title IX's prohibition against using gender as a basis for initiating or failing to initiate proceedings.

23.     During the investigation, Jane now alleged the March 13 consensual sexual act had been a forcible rape. She claimed John jabbed and forced his penis into her mouth, thrust it back and forth, choking her, stopped after one minute, and then left.

24.     John denied the accusation as a complete falsehood conjured up by his ex-girlfriend hurt by his public breakup with her.

25.     During the next five months, the University subjected John to the procedures in its Sexual Misconduct Policy, which the University had completely revamped the previous academic year.

26.     The revamped Sexual Misconduct Policy replaced the University's long-standing hearing process with a single investigator process in sexual misconduct cases.

27.     It eliminated any semblance of fairness toward students accused of sexual misconduct (who are overwhelmingly male), and reflected the University's intentional, institutionalized gender bias, in which female complainants are presumed to be "survivors" and "victims" of sexual assault and accused males are presumed to be "perpetrators" merely on the basis of the accusation.

28.     The contrast between the hearing process and the single investigator process was stark.

29.     In the hearing process, the parties had the opportunity to confront and question each other and witnesses and to present evidence before an impartial Hearing Panel. The Hearing Panel was given "sole discretion" to "weigh and consider" the testimony and evidence in making its decision. The accused was entitled to see the complainant's written complaint and to know the factual bases of the charges at the beginning of the process, and could respond to it.

30.     In the single investigator process, an investigator employed by the University interviewed the parties and witnesses separately behind closed doors, collected and weighed the evidence, and made findings of fact, credibility assessments, and initial determinations of responsibility in a Report for the Hearing Panel. The accused never heard what the complainant or any witnesses were asked in the investigation, and only knew what they said as filtered by the investigator in the Report.

31.     The accused was only entitled to "notice of the allegations" at some unspecified time "before the hearing." In practice, the University withheld that information until the accused received the investigator's Report *after* the investigation had ended, even though of course the complainant was fully aware of her allegations from the beginning of the process.

32.     Under the revamped Sexual Misconduct Policy, the "hearing" was not a "hearing" in any usual sense, where both parties are present, question each other and witnesses, and present evidence to a tribunal, which then deliberates and decides the case on the basis of its independent assessment of the testimony and evidence.

33.     Instead, the purported "hearing" was a "meeting" held by the Panel *separately* with each party, consisting solely of a 10-minute opening statement, a 5-minute final statement, and a question-and-answer period. The accused never heard what the complainant was asked or said at her meeting and never had the opportunity to question her directly but could only submit proposed questions for the Panel to ask (or not ask).

34.     Under the revamped Sexual Misconduct Policy, the Hearing Panel was required to "accept" the investigator's findings *unless* the accused was somehow able to present "significant information … during the hearing" that outweighed the Panel's deference to the investigator. Given the extremely limited, non-evidentiary nature of the hearing, and the secret investigation and untimely notice of allegations that preceded it, the accused had no realistic chance of presenting such information to the Panel.

35.     And, even though the Hearing Panel could question the investigator, the accused was not permitted to be present, and never knew what the investigator was asked or said.

36.     When the University first announced it was hiring a "sole investigator" for the revamped Sexual Misconduct Policy, a University official (the Coordinator of Sexual Violence

Response Services and Advocacy at the University's Center for Awareness, Response and Education ("CARE")), told the Northwestern community that having a full-time investigator to investigate "all sexual misconduct" would "help the voices of . . . survivors be heard" and was a "huge win" for them.

37.     The University appointed a special Title IX Coordinating Committee to create the revamped, "survivor-centered" Sexual Misconduct Policy. The Coordinating Committee prominently included the University's Women's Center, which described itself as "instrumental" in creating the revamped Policy, and CARE.  Both organizations are outspoken "advocates" for female students who report sexual misconduct (invariably referred to as "survivors" on these organizations' web pages), and have stated that "survivors' needs and rights" are their "first priority." Absent from the Coordinating Committee were any organizations advocating for basic fairness for all students in the process, including accused students.

38.     The University's institutional gender bias in favor of female accusers and against accused male students in the revamped Sexual Misconduct Policy predetermined the outcome in John's case.  The investigator and Hearing Panel accepted Jane's "forcible rape" story *carte blanche*, finding that Jane's version of events was "credible" but John's was not, despite the fact that this was a "she said, he said" case.

39.     Both the investigator and Hearing Panel relied solely on Jane's word and a handful of cherry-picked text and Facebook messages provided by Jane to tilt the credibility determination in Jane's favor.

40.     But they applied a double standard, excluding from consideration the scores of messages John provided that corroborated his version of events, contradicted Jane's version, and

undermined her credibility, and using the *absence* of corroborating messages as to certain details to make findings of fact and credibility assessments *against* John but *not against* Jane.

41. They discounted the dozens of text messages provided by John that showed Jane's accusations came only after a hurtful breakup and changed over time from a regretted, unsatisfying sexual act with her then-exclusive boyfriend into "borderline sexual assault," "sexual assault," and "rape."

42. This deliberate skewing of the evidence by the investigator and Hearing Panel violated both the University's contractual obligations to conduct a fair and impartial process and Title IX's prohibition against disparate treatment based on gender.

43. Following the Hearing Panel's decision, John appealed the ruling. The Appellate Panel specifically *rejected* the investigator's and Hearing Panel's finding of forcible rape, pointedly stating that "physical force was not used." But, instead of reversing the Hearing Panel's decision, the Appellate Panel found John responsible for sexual assault on *different grounds*, *i.e.*, it concluded that John had used "emotional and verbal coercion," apparently because John requested sex more than once that evening.

44. Jane had never accused John of emotional and verbal coercion; John had never been charged with that offense; and neither the investigator nor Hearing Panel had found him responsible for that conduct. Rather than giving John the opportunity to defend himself against the new charge at a rehearing, the Appellate Panel summarily decided the case against John on its new theory, ordered his immediate removal from the University, and closed the case.

45. At that time, the term "emotional and verbal coercion" did not appear in the Sexual Misconduct Policy and the term "coercion" was not defined. Following John's case, the University issued a Revised Policy, which clarified that "coercion" was defined as "severe or

persistent pressure causing fear of significant consequences from the respondent if one does not engage in sexual activity." That definition would have precluded the Appellate Panel's decision in John's case.

46. The University imposed one of the most severe sanctions on John. He has been stripped of his ability to continue his education at Northwestern for a minimum of two years, with no guarantee he will ever be re-admitted.

47. As a result of Northwestern's actions, John's academic and professional prospects have been shattered and his economic future has been severely compromised.

48. John's educational record will permanently reflect that he was excluded from the University for a violation of the Sexual Misconduct Policy, and the University will report his disciplinary record to third parties, including schools to which he has tried to transfer, graduate schools, prospective employers, employers, and licensing agencies.

49. Through its deeply unfair Sexual Misconduct Policy, Northwestern has branded John as a sexual offender, making admission as a transfer student to another college or university of the same or similar caliber to Northwestern impossible and severely disadvantaging him in future academic, professional, and career opportunities.

50. John was rejected by 11 schools to which he applied as a transfer student, including schools where he had previously been accepted. Several of the schools told him they would not even consider his application and academic record because of his disciplinary record.

51. John will be stigmatized for years to come by the fact that he was found responsible for sexual assault. He will have no choice but to disclose the finding whenever he is asked whether he was the subject of a college disciplinary proceeding or found responsible for a disciplinary violation, a common question in transfer applications to other colleges or for

graduate or professional school, in professional licensure applications, in government employment applications, and in other employment or prospective employment circumstances.

52.     Besides the irreversible damage to his college transfer, post-graduate, employment, and earning prospects, the University's finding of sexual assault has lasting social and reputational harm. The University's labeling of John as a sexual offender will continue to have dramatic, life-altering consequences for him.

53.     Northwestern's conduct has caused John severe emotional and physical distress, including panic attacks, loss of appetite, an inability to sleep through the night, nightmares, and anxiety, all requiring counseling. He has been diagnosed with post-traumatic stress disorder.  He has expressed a desire to kill himself more than once.

54.     For all these reasons, John brings this action to obtain injunctive and declaratory relief and monetary damages based on causes of action under Title IX of the Education Amendment of 1972, breach of contract, estoppel and reliance, negligence, negligent infliction of emotional distress, unfair and deceptive trade practices, and defamation.

### THE PARTIES

55.     Plaintiff John Doe is a citizen of the Commonwealth of Pennsylvania. During the events described herein, John was enrolled as a full time, tuition-paying, undergraduate student at Northwestern University.

56.     Defendant Northwestern University is a leading coeducational, research university with a principal address of 833 Clark Street, Evanston, IL 80208.

57.     Northwestern opened its doors in 1855 on the shores of Lake Michigan just north of Chicago with two faculty members and 10 students. (*See* "About Northwestern," http://www.northwestern.edu/about/index.html). It now is home to a dozen colleges and schools across three campuses with 21,000 total enrolled students. (*Id.*, "Facts").

58.     Northwestern is among the nation's leading universities, ranking #12 in U.S. News & World Report's 2017 National Universities list. (*See* U.S. News & World Report, National Rankings, http://colleges.usnews.rankingsandreviews.com/best-colleges/northwestern-1739/rankings).

59.     At all times material hereto, Northwestern acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of Northwestern's business, mission and/or affairs.

## JURISDICTION AND VENUE

60.     For diversity purposes, John is a citizen and resident of the Commonwealth of Pennsylvania, and Northwestern is a citizen of the state of Illinois.

61.     This Court has original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and 28 U.S.C. § 1331, and jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. § 1367.

62.     This Court has original diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

63.     Venue is proper in the Northern District of Illinois pursuant to 12 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to John's claim occurred in the Northern District of Illinois and because Northwestern resides in Cook County.

## II.     FACTUAL ALLEGATIONS

### A.     John's Decision to Attend Northwestern University

64.     Prior to matriculating at Northwestern in September 2014, John had an outstanding high school academic record and college admission test scores.

65.      John was accepted to several of the nation's top undergraduate universities and colleges. After weighing various factors and considerations of each university, John made a conscious and informed decision to commit to Northwestern, and he entered the freshman class for the 2014-2015 academic year.

### B.     The Sexual Misconduct Policy Used in John's Case Was Permeated With Intentional, Institutionalized Gender Bias Against Male Students Accused of Sexual Misconduct

66.     At the time of Jane Roe's report against John in late 2015, the policies and procedures for investigating and resolving student allegations of sexual misconduct were set forth in the 2015-2016 Student Handbook in the Code of Student Conduct's Sexual Misconduct Policy ("Sexual Misconduct Policy" or "Policy"). (Relevant excerpts from the 2015-2016 Student Handbook are attached hereto as Exhibit A.)

67.     Gender bias against male students accused of sexual misconduct was built into the Sexual Misconduct Policy used in John's case.

68.     That Policy was the result of a deliberate effort on the part of the University and the Office of Student Conduct to protect female complainants from the discomfort of being confronted and questioned at a hearing by the male students they had accused.  In setting out to accommodate female students, the University deliberately created an inequitable process, in which female students were presumed to be "survivors" and "victims" of sexual assault simply on the basis of having made an accusation and male students are presumed to be "perpetrators."

69.     Like many other colleges and universities, Northwestern revamped its Title IX sexual misconduct policies and procedures in response to the Department of Education's Office for Civil Rights' ("OCR") "Dear Colleague" Letter issued in April 2011, and amid mounting student activist and media criticism of the University's perceived mishandling of sexual misconduct allegations brought by female complainants. The OCR is the governmental office charged with enforcing Title IX and its implementing regulations.

70.     In its overzealous response to the Dear Colleague Letter, the University has ignored widespread criticism of the Dear Colleague Letter from a broad range of groups, including: (1) the American College of Trial Lawyers, which issued a report stating that accused students are deprived of "fundamental fairness" under OCR's Dear-Colleague system of investigation and adjudication; (2) the ABA Criminal Justice System Due Process Task Force, a committee consisting of all interested parties (including victim advocates), which issued a report recommending changes in college procedures in the interest of fundamental fairness for accused students; and (3) law professors from Harvard and other leading law schools who have protested the lack of fundamental fairness in OCR's Dear Colleague Letter policies and procedures. (*See* https://www.nacua.org/docs/default-source/new-cases-and-developments/New-Cases-April-2017/white-paper-re-sexual-assault-investigations.pdf; https://www.americanbar.org/content/dam/aba/publications/criminaljustice/2017/ABA-Due-Process-Task-Force-Recommendations-and-Report.authcheckdam.pdf). The 28 Harvard Law professors stated that OCR's directives "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." (https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html).

71.     Before the University revamped its Sexual Misconduct Policy, the parties involved in Northwestern's proceedings for resolving student sexual misconduct allegations had a full, equal, and fair opportunity to question and confront each other and witnesses and to present evidence at a hearing, and the Hearing Panel made its decision based on the parties' and witnesses' active participation in examination, cross-examination, and presentation of evidence. (*See* Excerpts from Northwestern's 2013-2014 Student Handbook, attached hereto as Exhibit B, at 66: "[a]ll hearings . . . will include . . . those complaining and complained against . . . . Witnesses and other individuals presenting information will be called to the hearing room"; "[a] hearing panel may consider and weigh, at its sole discretion, any pertinent information, records, exhibits, and written statements presented at the hearing.").

72.     That changed in the 2014-15 academic year when Northwestern announced its revamped Sexual Misconduct Policy (which was used the following year in John's case). Under the revamped Sexual Misconduct Policy, the University adopted a single investigator process that drastically changed the role of the Hearing Panel and the nature of the hearing.

73.     Under the revamped Policy, the Deputy Title IX Coordinator in the Office of Student Conduct oversaw reports of sexual misconduct against students. (Ex. A at 87). The Office of Student Conduct hired and trained the investigator, appointed and assigned cases to Hearing Panels, and trained Appellate Panel members.  (Ex. A at 128-129, 142, 147).

74.     At the time of Jane Roe's complaint, Dr. Tara Sullivan was both the Director of the Office of Student Conduct and Deputy Title IX Coordinator. (Ex. A at 83, 86).

75.     The Office of Student Conduct used the "preponderance of the evidence" standard to determine responsibility for violations of the Policy. (Ex. A at 87, 138). This meant that "the investigator … or panel must determine more likely than not what occurred."  (Ex. A at 138).

76.     Students involved in the process could be accompanied by one advisor during the investigation and hearing, but the advisor could not speak, write, or otherwise communicate on behalf of the student.  In cases alleging sexual assault, stalking, or dating or domestic violence, the advisor could be an attorney who was still limited to "the supportive and not participating role."  (Ex. A at 89, 132).

77.     Thus, even in cases involving allegations of sexual assault with serious consequences for the accused, the accused's attorney could not speak, write, or otherwise actively participate on behalf of the accused in any stage of the process.

78.     Every phase of the revamped Policy – the investigation, the hearing, and the appeal – was skewed to favor female complainants and to disfavor accused male students.

### 1.     The Policy's Investigation Process

79.     Under the revamped Sexual Misconduct Policy, a single investigator employed and trained by the Office of Student Conduct was given complete control and discretion in the investigation.  (Ex. A at 92, 142).

80.     The investigator interviewed the parties separately and decided what questions to ask them. The investigator decided what witnesses (if any) to interview, what questions to ask them, and what "evidence" to collect. The accused never knew what the complainant or any witnesses actually said in the investigation or what evidence had been gathered, but only knew what the investigator chose to tell him in the investigator's Report. (*Id.*)

81.     The accused was only entitled to "notice of the allegations" at some unspecified time "***before the hearing***" (Ex. A at 131), which meant the accused might not be told exactly

what he was accused of doing during the investigation. This contrasts with the previous hearing process, which required a written complaint to be filed setting forth "the circumstances that form the basis of the allegations," a copy of which "shall be promptly provided to the student complained against." (Ex. B at 65).

82.     The revamped Sexual Misconduct Policy was applied in John's case. As a result, he had to piece together what he was accused of doing based on questions the investigator asked him and only learned the full extent of the accusations when he was allowed to review the investigator's Report *after* the investigation had ended.

83.     In the Report, the investigator made findings of fact, evaluated the credibility of the parties and witnesses, weighed the evidence, and made initial determinations of responsibility (*e.g.*, whether it was more likely than not that the complainant did not voluntarily give consent; whether the accused's version of events was credible or not credible; whether it was more likely than not that forcible or nonconsensual sex occurred). (Ex. A at 92, 142).

84.     The investigator alone controlled what information was presented in the Report in support of the investigator's findings and credibility assessments.

## 2.     The Policy's Hearing Panel Process

85.     The Investigator's Report was provided to the parties and a three-member Hearing Panel consisting of faculty and staff and a Panel Coordinator from the Office of Student Conduct.  Thereafter, a hearing was held.  (Ex. A at 92, 142-143).

86.     In contrast to the prior hearing process, under the revamped Policy, the "hearing" was not a "hearing" in any usual sense, where both parties have the opportunity to question and confront each other and witnesses and present evidence before a tribunal, which then deliberates and decides whether the alleged sexual misconduct occurred on the basis of its independent assessment of the testimony and evidence.

17

87.    Instead, under the revamped Policy, the Hearing Panel met separately with the parties, not together, in individual "meetings." (Ex. A at 92, 143).

88.    At their separate meetings, each party was limited to a 10-minute opening statement, a 5-minute final statement, and a question-and-answer period with the Panel.  (Ex. A at 143).

89.    The accused never heard what the complainant said at her meeting, and had no opportunity to directly question or confront her.  He only could submit proposed questions for the Panel, which the Panel could ask or choose to not ask.  (*Cf.* Ex. A at 92, 142-143; Ex. B at 66: "[a]ll hearings … will include those complaining and complained against …. Witnesses and other individuals presenting information will be called to the hearing room").

90.    Even though the Hearing Panel could meet with the investigator to ask questions, the accused was not permitted to be present, could not directly ask questions of the investigator, and was not told what the investigator was asked or said.  (Ex. A at 143).

91.    The accused had no right to object to members of the Hearing Panel on conflict of interest grounds except immediately before the hearing began. (Ex. A at 143).  The accused was given no advance notice of their identities, and therefore, had no meaningful opportunity to object and seek to disqualify a conflicted Panel member.

92.    As detailed later in this Complaint, that is what happened to John.  He did not realize until *after* his hearing that one of his Hearing Panelists reported directly to the Office of Student Conduct, the Office that charged and investigated John, which created a clear conflict of interest that should have been disclosed to John in advance of the hearing.

93.    Under the revamped Policy, the Hearing Panel was not permitted to "consider and weigh" the evidence and testimony "at its sole discretion," as was the case in the prior hearing

process. *(See* Ex. B at 66: "a hearing panel may consider and weigh, in its sole discretion, any pertinent information, records, exhibits, and written statements presented at the hearing").

94. Instead, the Panel's decision-making role was limited by a mandated deference to the investigator's findings: "Absent significant information presented by the reporter or respondent during the hearing, the Panel will accept the findings presented in the investigator's report and utilize them to determine responsibility for each of the alleged violations.") (Ex. A at 144).

95. The Panel deliberated and decided responsibility for the alleged violation based solely on the investigator's Report, the investigator's testimony (if any), and the information heard from the parties individually at their meetings with the Panel. (Ex. A at 92, 144).

96. Since the accused's defense before the Panel was restricted to a 10-minute opening statement, a 5-minute final statement, and answering Panel questions, the opportunity for an accused student to present "significant information" to overcome the Panel's deference to the investigator's Report was effectively nonexistent.

97. The Panel's deference to the investigator – coupled with the greatly curtailed participation of the parties and witnesses at the purported hearing – prevented the Panel from making its own, independent assessment of the investigator's findings and credibility determinations.

### 3. The Policy's Appellate Panel Process

98. On appeal, under the revamped Sexual Misconduct Policy, accused students continued to have the decks stacked against them.

99. Appeals were decided by a three-member Appellate Panel made up of senior-level administrators and academic leaders from the Division of Student Affairs and the Office of the Provost. (Ex. A at 147).

100.    Like the Hearing Panel's deference to the investigator's findings, the revamped Policy required the Appellate Panel to "presume[]" that the "original finding and sanction . . . have been decided reasonably and appropriately," thereby according further deference to the investigator's original findings.  (Ex. A at 145-147).

101.    Because Panel Hearings were not recorded (Ex. A at 145), the Appellate Panel had no way of knowing what the parties actually said at the hearing, and relied solely on the Hearing Panel's decision for that information.

### 4.    The Policy's Expanded Definition of Sexual Assault

102.    In addition to these skewed procedures that hampered an accused student's ability to defend himself, the revamped Sexual Misconduct Policy used in John's case contained an expanded definition of sexual assault that encouraged female complainants to bring sexual assault allegations based on verbal conduct alone.

103.    Because the March 13, 2015 incident between John and Jane occurred in the 2014-2015 academic year, the Office of Student Conduct used the definitions of sexual assault, sexual harassment, and consent in the 2014-2015 Handbook for John's case. (Relevant excerpts from the 2014-2015 Student Handbook are attached hereto as Exhibit C.)

104.    The 2014-2015 Handbook (the first handbook with the revamped Sexual Misconduct Policy) defined "Sexual Assault" as (among other things) "Sexual Penetration without Consent" and "Sexual Contact without Consent" and defined "Sexual Harassment" in relevant part as "any unwelcome conduct of a sexual nature" where the conduct "creates a hostile, intimidating or offensive academic or working environment" or where "other verbal, nonverbal, or physical conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a person's ability to participate in or benefit from an educational program or activity." (Ex. C at 34-35).

20

105. In the 2014-2015 Handbook, "consent is present when clearly understandable words or actions manifest a knowing and voluntary agreement to engage in specific sexual or intimate conduct." (Ex. C at 32).

106. The 2014-2015 Handbook defined "voluntary consent" as that which is "freely given and cannot be the result of force (violence, physical restraint, or the presence of a weapon), threats (indications of intent to harm, whether direct or indirect), intimidation (extortion, menacing behavior, bullying), coercion (undue pressure), or fraud . . . ." (Ex. C at 33).

107. Neither "coercion" nor "undue pressure" was defined in the 2014-2015 Handbook. Although students went through an on-line training on sexual assault, no aspect of that training clarified what it meant to use "undue pressure" to "coerce" a lucid partner to perform a sexual act she did not wish to perform, or what "undue pressure" meant when students were in a sexually-exclusive relationship.

108. The Policy's expanded standard for sexual assault contrasted with the previous standard, which defined sexual assault as "an act of sexual violence" involving "any intentional or knowing touching … without the consent of the victim," or "when the victim is forced to do so against his or her will," or as "any nonconsensual acts involving sexual penetration …." (Ex. B at 51, 52). The previous standard specifically excluded "[v]erbal conduct, without the requisite physical touching" from the definition of sexual assault. (Ex. B at 52).

109. By including "coercion" and "undue pressure" as forms of sexual assault in the revamped Sexual Misconduct Policy, without defining these terms, the University encouraged students and Northwestern staff and faculty to engraft their own subjective meanings on to them, including (as happened in John's case) defining "coercion" as merely verbal requests for sex.

21

110.    At the beginning of the 2016-2017 academic year, the University issued a Revised Policy on Sexual Misconduct.

111.    In the Revised Policy, the University amended the "voluntary consent" provision by eliminating the term "undue pressure" and defining the term "coercion" as "severe or persistent pressure causing fear of significant consequences from respondent if one does not engage in sexual activity . . . ." (*See* Revised Policy on Sexual Misconduct, September 2016, at 3, attached hereto as Exhibit D).

112.    Upon information and belief, the University amended the terms "coercion" and "undue pressure" as a result of the actions of the Appellate Panel in John's case.

**C.    Northwestern's Deputy Title IX Coordinator, Title IX Coordinating Committee Members, and Administration Spokespersons Openly Acknowledged That Gender Bias Was the Motivating Factor in Creating the Sexual Misconduct Policy**

113.    The University's fundamentally unfair investigative and adjudicative procedures in the Sexual Misconduct Policy disproportionately disadvantaged accused students (who are overwhelmingly male) and had the intended effect of presuming their guilt and shifting the burden of proof on them to prove their innocence.

114.    These procedures were intentionally designed by the University with the goal of protecting female accusers from the emotional harm of cross-examination and confrontation by the male students they accused, and of making their needs and rights as presumed "survivors" and "victims" of sexual assault the University's "first priority."

115.    This University goal was explained to Northwestern students by Dr. Sullivan, Director of the Office of Student Conduct and Deputy Title IX Coordinator, in an October 2014 Daily Northwestern article.

116.    Dr. Sullivan told students: "[i]n the past students were in the rooms together . . . [t]hat was something we heard from students they were very uncomfortable with. Now, they won't be in the room together to confront each other directly."

(https://dailynorthwestern.com/2014/10/01/campus/new-disciplinary-rules-include-independent-investigator-in-student-conduct-disputes/).

117.    In another Daily Northwestern article, Dr. Sullivan explained to students that "Northwestern's conduct process was rewritten completely . . . . [i]t is a completely new process."  (https://dailynorthwestern.com/2015/02/09/campus/northwestern-to-add-title-ix-investigator-amid-process-overhaul/).

118.    Under the "defunct . . . process . . . the complaining and responding students . . . were both in the room for the hearing, each made their case and called witnesses before the panel, which decided whether the respondent had violated policy." (*Id.*).

119.    According to another University administrator, for the "new process" the University would be hiring a "sole investigator who's investigating all sexual misconduct," and that "*having a full-time investigator will help the voices of students and survivors be heard.*" (*Id.*) (emphasis added).

120.    Dr. Sullivan explained that these fundamental changes were based on recommendations from the Office for Civil Rights. (*Id.*)

121.    They were also made in response to student activists who advocated for a complete overhaul of the University's policies to put "survivors' first" and to hold "perpetrators" and University administrators accountable for Northwestern's "rape culture." Student activists' protests, rallies, and petitions directed to Northwestern's President were well-publicized in campus publications and blogs, as were two Title IX lawsuits brought by female students against

Northwestern for its alleged mishandling of their complaints against a professor.

(https://dailynorthwestern.com/2013/11/21/top-stories/in-focus-title-ix-northwestern-joint-national-push-to-address-sexual-assualt/; https://dailynorthwestern.com/2014/05/27/top-stories/in-focus-northwestern-community-looks-to-change-sexual-assault-procedures-as-ludlow-case-ma.../; https://www.northbynorthwestern-whats-now-next/).

122.    The Office of Student Conduct under Dr. Sullivan spearheaded the survivor-centered overhaul, in collaboration with a specially-formed Title IX Coordinating Committee, consisting of ten University offices – Dean of Students, Student Conduct, Office of Sexual Harassment Prevention, Center for Awareness, Response and Education (CARE), Northwestern University Police Department, Office of Equal Opportunity Access, Athletics, Women's Center, Counseling and Psychological Services (CAPS), and Global Safety. (*See* http://www.northwestern.edu/care/about-us/philosophy/index.html).

123.    The University's inclusion of the Women's Center and CARE, two outspoken advocacy offices for female "survivors" of sexual violence, without any counter-balancing inclusion of organizations advocating for basic fairness for all students involved in the process (including accused males), led to Northwestern's biased, "survivor-centered" Sexual Misconduct Policy.

124.    At the time the Complaint against John was being investigated and adjudicated, the Women's Center recognized its favored role when it stated on a web page to the Northwestern community that it "has been instrumental in creating major University policies, including the policies on Sexual Harassment and Sexual Assault, and Civility, Mutual Respect & Violence in the Workplace." (http://www.northwestern.edu/womenscenter/services-support/advocacy.html)(accessed Aug. 15, 2017)(archived version available at

24

https://web.archive.org/web/20160729075032/http://www.northwestern.edu/womenscenter/servi
ces-support/advocacy.html).

125.    The Women's Center did not see itself as impartial (and clearly was not) in the
area of sexual misconduct policy, as evidenced by the repeated references on its web pages to
"survivors" of sexual assault, a term that presumes a sexual assault occurred.

126.    According to the Women's Center's website at the time the Complaint against
John was being investigated and adjudicated, it sought to "*give voice and power to survivors of
sexual assault* …." (http://www.northwestern.edu/womenscenter/about/center-initiatives.html)
(emphasis added)(accessed Aug. 15, 2017)(archived version available at
https://web.archive.org/web/20160729075151/http://www.northwestern.edu/womenscenter/about
/center-initiatives.html).

127.    Its staff members were "trained advocates for survivors of … sexual assault," who
believe that "all survivors have the right to respect, information, confidentiality, and social
justice."  (http://www.northwestern.edu/womenscenter/services-
support/advocacy.htlm)(accessed Aug. 15, 2017)(archived version available at
https://web.archive.org/web/20160729075032/http://www.northwestern.edu/womenscenter/servi
ces-support/advocacy.html).

128.    In a link Northwestern sent to students, the Title IX Coordinating Committee
described CARE, the other women's advocacy Office on the Committee, as "a resource for
students who have experienced sexual violence, where they can get survivor-centered
advocacy…. CARE is staffed by professionals with extensive experience in the field of sexual
violence survivor advocacy." (https://news.northwestern.edu/stories/2014/03/title-ix-
coordinating-committee-response-to-online-petition-and-asg-resolution).

129. On its "philosophy" web page, CARE openly acknowledges that it "adheres to a feminist approach to sexual violence," and that "CARE staff strive to act as allies against the structure of privilege and oppression which support gender based violence . . . [t]he survivor's needs and rights are the first priority of CARE and guide the planning and decision-making of CARE staff." (http://www.northwestern.edu/care/about-us/philosophy/index.html).

130. CARE counsels students, family, and friends to "BELIEVE THE SURVIVOR." (http://www.northwestern.edu/care/get-help/help-a-friend/sexual-assault/index.html) (capitalized letters in original). Inherent in these instructions is a directive to presume that the allegations are true and that the accused student who denies the allegations is not to be believed.

131. CARE distributes buttons that state, "Only Yes Means Consent," despite the fact that Northwestern's own Policy states that "[c]onsent can be given through words and actions."

132. In spite of CARE's advocacy mission in support of accusers and its dispensing of misleading information about the University's consent policy, the University gives University Hearing Panelists three hours of training conducted by CARE. (https://dailynorthwestern.com/2017/02/06/top-stories/as-university-aims-to-increase-awareness-of-title-ix-process-reporting-remains-a-taxing-experience/). Upon information and belief, there is no "accused-oriented" training of the Panelists, including training about the dangers of conflating normal adolescent sexual inexperience with sexual misconduct, to counteract the victim-favoring training provided by CARE.

133. The University's Sexual Misconduct Response & Prevention instructions on how to respond to a report of sexual assault have adopted the same "survivor" rhetoric and display the same lack of impartiality. The University instructs students, faculty, and students that their responsibility is to "[p]rovide nonjudgmental support. . . . Your primary responsibility is to

26

remain supportive of the survivor . . . ." (http://www.northwestern.edu/sexual-misconduct/get-help/help-someone-else.html).

134.    Although purporting to be gender neutral, Northwestern's Sexual Misconduct Response & Prevention Services (offering confidential counseling, medical resources, and reporting resources) provide guidance exclusively to sexual assault "survivors." No guidance or support is offered to students accused of sexual misconduct. (*Id.*)

135.    The University instructs all Northwestern employees, including student employees, that they are required to report "incidents of sexual misconduct." They are told by the University that the "supportiveness of your response can be central to the healing process," and they are given "Do and Don'ts," including "[g]ive the survivor your complete attention," "[t]ell the survivor 'I believe you,'" "[t]his was not your fault," and "[a]sk the survivor what they need." (*Id.*)

136.    Faculty and staff also are told on a University Sexual Harassment Prevention Office web page to "[a]void questions that suggest blame or show doubt." (http://www.northwestern.edu/sexual-misconduct/docs/Faculty-staff%20disclosures%20handout.pdf)

137.    The gender bias in the Policy also is seen in the resource guides published by Northwestern's Title IX Office, which presume accusers are telling the truth and accused students are responsible for sexual misconduct even before the investigative and adjudicatory process has begun.  While the resource guides instruct accusers to preserve evidence of what happened (including electronic communications), the guides fail to instruct accused students to preserve evidence, with the implicit assumption that, as the guilty party, they have no

exculpatory evidence to preserve. (http://www.northwestern.edu/sexual-misconduct/get-help/help-someone-else.html).

138.    Throughout the Sexual Misconduct Policy, the term "victim" was used to describe a person who alleged sexual misconduct, a term which presumes the allegations are true before they have been evaluated. (*See*, *e.g.*, Ex. A at 141, 145).

139.    The Sexual Misconduct Policy reflected and fostered a gender-biased cultural climate on campus, and has been criticized by professors, students, and national media observers.

140.    One high profile critic is Laura Kipnis, a Northwestern professor in the department of radio, television and film and a long-time feminist writer and activist. She has publicly and vocally identified the gender-bias issues of Northwestern's Sexual Misconduct Policy.

141.    She wrote that the University's Sexual Misconduct Policy comes out of an environment that is obsessed with "helpless victims" (female) and "powerful predators" (male) and fosters a campus climate that heightens the "sense of vulnerability" of female students and subjects accused students (who are almost always male) to an "underground world of secret tribunals and capricious, medieval rules." (*See* http://laurakipnis.com/wp-content/uploads/2010/08/Sexual-Paranoia-Strikes-Academe.pdf; *see also* http://chronicle.com/article/My-Title-IX-Inquisition/230489).

142.    The institutional bias of the Office of Student Conduct was so systemic that it opened a Title IX investigation into *Professor Kipnis* when two female students complained that her criticisms of the Sexual Misconduct Policy "chilled" female accusers from coming forward. In its zeal to placate female accusers, student activists, and OCR, the Office of Student Conduct

charged Professor Kipnis with "retaliation" for simply pointing out gender bias in the Sexual Misconduct Policy.

143. Despite their direct involvement in Title IX cases, Dr. Sullivan and Dean Adams joined and lauded a group of students who protested the University's initial lack of reaction to Professor Kipnis's criticisms. (http://dailynorthwestern.com/2015/03/10/campus/students-carry-mattresses-pillows-to-protest-professors-controversial-article/).

144. Although the University eventually cleared Professor Kipnis of any wrongdoing, the episode demonstrated just how far the University had gone in creating an institutional bias in favor of female "survivors" and "victims."

145. In documenting the investigation against her, Professor Kipnis criticized the Sexual Misconduct Policy's closed-door, inquisitorial process (the same process that the University imposed on John in his case); the lack of notice of the charges and bases for them until the investigator interrogates the accused; the prohibition against recording interviews or proceedings; the "mysterious" extent of the investigator's powers; procedures that are "utterly mystifying"; investigators "doubl[ed] as judge and jury"; "ad hoc rules and outcomes"; and the University's new standards of what constitutes sexual assault and rape, in which "[a]mbivalent sex becomes coerced sex," and in which the University's investigators and adjudicators intrude into "murky situations involving . . . conflicting stories, and relationships gone wrong," "power differentials between romantic partners," and "debatable and ultimately conservative notions about sex, gender, and power." (*See* My Title IX Inquisition, *supra*, at 4-10).

146. In an ironic analysis of why she, a woman, experienced the "inquisition" and "McCarthyist abuse" of the Office of Student Conduct's "kangaroo court," Professor Kipnis revealed the extent of Northwestern's institutional gender bias against males. She wrote, "No

male academic in his right mind would write what I did. Men have been effectively muzzled, as any number of my male correspondents attested." (*Id.*)

147.    Professor Kipnis continued to research and critique Northwestern's Title IX adjudication process in her 2017 book, *Unwanted Advances: Sexual Paranoia Comes to College Campuses*, in which she exposed the eagerness of Northwestern's Title IX investigators to believe improbable assertions as credible so long as they upheld stereotypes of men as "powerful predators" and women as "endangered damsels," and to deem probable assertions as not credible when they did not align with these gender stereotypes.

148.    The Chronicle of Higher Education, a nationally-known publication, has covered Northwestern's "changing campus climate about sex," "chain reaction of controversies," and "uproar" of negative national media attention following the University's adoption of the new Policy and investigation of Professor Kipnis. (*See*, *e.g.*, The Chronicle article, '*Kipnis Case Highlights Perilous Calash of Title IX and Academic Freedom*' dated Jun e03, 2015 (http://www.chronicle.com/article/Kipnis-Case-Highlights/230621); The Chronicle Article, '*A Professor, a Graduate Student, and 2 Careers Derailed*' dated June 19, 2015 (http://www.chronicle.com/article/A-Professor-a-Graduate/231007); and, The Chronicle Article, '*Troublemaker: Laura Kipnis*' dated December 13, 2015 (http://www.chronicle.com/article/Troublemaker-Laura-Kipnis/234593).

**D.    Facts Relating to Jane Roe's Accusations**

**1.    John and Jane Roe's Relationship**

149.    John and Jane Roe met in the fall of 2014 through their membership in a small extracurricular group on campus. At that time, John was a freshman and Jane was a sophomore. They became close friends, and in early 2015 began an intimate, exclusive romantic relationship.

150.     Their relationship was intense, and like those of many young individuals during college, they had difficulty figuring out how to have an equal relationship. John worked hard to please Jane, helping her with homework and delivering her food. Jane often accused John of being selfish for normal blunders when, for example, he was late to meet her. She often held grudges.

151.     John found himself apologizing to Jane for these perceived transgressions in an effort to placate her. That was the pattern in their relationship, with Jane frequently becoming angry with him for reasons having nothing to do with sex, prompting John to apologize and admit his shortcomings to bring harmony back to the relationship. John deferred to Jane about who could know about their exclusive relationship. While he wanted everyone to know, she controlled who could be told.

### 2.     The March 13, 2015 Consensual Sexual Act and Initial Text Messages About It

152.     On March 13, 2015, John texted Jane Roe after midnight for a "hug" after a long, stressful day.  Jane texted back, "Yes of course.  Come over," and they met at her sorority house. Neither had alcohol that night and neither drank when they were together that night.

153.     They went to one of the common areas on the main floor of the house, sat on a couch, and were being "flirty." They began making out. Realizing that others in the house might stumble upon them, they moved to the more secluded TV room. As time passed, their making out became more intense, and progressed to unbuttoning each other's pants. Jane placed her hands under John's clothes and squeezed his leg, which signaled to him from their previous sexual encounters that she was interested in taking things further.

154.     They talked about what to do next. They discussed that sexual intercourse was "not on the table" because the TV room was not private enough, and they could not go to their

31

bedrooms, as they both had roommates. John asked her: Did she want him to give her oral sex; Did she want to give him oral sex; Should we stop?

155.     John had always been verbal and communicative during the lead up to any physical activity with Jane since the beginning of their sexual relationship.

156.     John then suggested that Jane give him oral sex. Jane said the time and place were not great. They went back to touching each other and it was clear to John from the way Jane was touching him that this was not a casual make out.

157.     In several previous sexual encounters, they had each given and received oral sex.

158.     John made another suggestion that Jane give him oral sex. Jane stated she did not want to do it on the couch. John looked around the room, and suggested they move over to a nearby ottoman. John moved to the ottoman; Jane followed him there and crouched down. John suggested positioning themselves so that he was below her, and asked if it would work. Jane replied, "It will work." She then got down on her knees, lowered her head to his penis, opened her mouth, and began performing oral sex on John.

159.     John believed that through her actions and words – moving to the ottoman, agreeing that the positioning will work, lowering her head to his penis, freely and of her own volition opening her mouth and giving oral sex – Jane had consented to the act.

160.     After no longer than one minute, Jane ceased fellatio. John did not climax. He looked down, confused, and realized she appeared to be uncomfortable. John asked her what was wrong and if she was okay. She responded by asking him, "Are you done now?" He was alarmed that her tone had changed from flirtatious to serious.

161.    John immediately pulled up his pants. Given her question, tone of voice, and facial expression, John realized she had changed her mind and did not wish to continue. He was upset that she looked unhappy.

162.    As was his way with her in their relationship, where he was always trying hard to please Jane, John apologized to her, whereupon she left the room and walked to a staircase. John asked her if she wanted to talk about what happened, and she said that she did not. She called him "selfish." He left the sorority house.

163.    The two exchanged text messages in the early morning hours that same day about the incident and their overall relationship. Feeling badly that he had asked for sex, John wrote, "Well now you've seen my selfish side." Jane texted back, "No I just think you benefit more emotionally, mentally, and physically." John wrote, "I didn't realize you were angry tonight." Jane responded, "I wasn't. I think about it a lot [who benefits more from the relationship], not just tonight." John followed up by texting, "Alright I feel really bad about myself now," to which Jane responded, "I don't think you should, we're just different people."

164.    Later that same day, on the evening of March 13, Jane and John had a long and amiable text conversation, mostly on unrelated matters, in which she asked him, "Are you dropping by?" He responded "yes," but then texted her he had changed his mind because he had a stomach ache. She responded, "Feel better."

165.    In none of these text messages did Jane remotely suggest that John had subjected her to forced or non-consensual sex on March 13. The messages are a back-and-forth discussion on who gets more enjoyment out of their sexual encounters and who "benefit[s] more" overall in the relationship, a commonplace, everyday discussion between young people who are trying to deal with their differences.

### 3.    The Breakup and Initial Text Messages About It

166.    Two days later, on March 15, John broke up with Jane during a social gathering of their group. They had been drinking and Jane expressed the sentiment that she didn't value John. No longer able to take Jane's criticism, John burst out with a series of hurtful comments about Jane including that he wasn't attracted to her, they should never have been a couple, and that they should not call one another boyfriend/girlfriend.

167.    John quickly regretted how he had broken up with her. He knew Jane was hurt and that he had embarrassed her in front of their friends. When he asked to speak with her about the breakup "in a sober context," Jane texted him back on March 17 with this message: "Please be respectful and let this all end with the following text. Anything besides this would be excessive. Just have a good spring break. Let me have fun and you can have yours. . . . I think everything was said that night that needed to be said . . . and in a relationship in which I felt like you benefited most of the time, I'd like to feel like I win this time around."

168.    In response, John texted Jane that he "really did not think it was going to end the way it did and I'm sorry a million times for that. . . . You have been one of the integral parts to my college experience." He hoped over time that they would return to being friends.

### 4.    Jane Roe's Accusation of "Borderline Sexual Assault"

169.    Three weeks later, on April 11-12, the two again exchanged texts about the breakup. Jane told John that their mutual friends in the group described him as being "sad" about it, and he said he was very sad because he cared about her. He asked her, "what did you tell them?" and she responded, "I just think we focus on different things in our versions . . . . When you tell your side. And when I tell my side. They're not gonna be wrong, but they're gonna be different." He responded, "Well of course because we felt different things from what happened.  It is a natural part of things like this."

34

170.     Then, Jane brought up their "last time" having sex together, and said that it was "awful" and was "also borderline sexual assault." The timing of this accusation was right after Northwestern launched Sexual Assault Awareness Month during which it promoted its revamped 2014-2015 Sexual Misconduct Policy, which did not define key terms and encouraged students to wrongly conclude that verbal requests for sex are "undue pressure" and hence sexual misconduct.

171.     Jane's accusation shocked John. Sexual assault had never been a part of their prior conversations, and he could not fathom why she would say that, as he had made clear throughout their relationship that sexual experiences are only good for him if both people are enjoying themselves.

172.     He immediately texted back, "Oh my god no don't do that . . . I should have picked up the cue that you weren't into it but for whatever reason I never picked up on that cue, but it was NOT sexual assault. Like don't even think that. If you felt that you would have acted much differently . . . . none of that happened. How did any of that happen? This is just taking it too far."

173.     Jane's sudden accusation came amidst texts that were friendly and commonplace, including the two chatting about the latest episode of Game of Thrones. After Jane's accusation, she texted John about the Game of Thrones' episode he was about to watch: "Yup yup enjoy it was pretty good" – hardly the words or actions one would expect a victim of "borderline sexual assault" to express to her alleged assailant.

### 5.     Text Messages Show that Jane Roe Repeatedly Sought Out John for Relationship Advice, Favors, and Emotional Support *After* Accusing Him of Borderline Sexual Assault

174.     After her "borderline sexual assault" accusation, Jane reached out to John for his advice, assistance, and emotional support throughout the remainder of the spring term.

175. For example, on April 17, she texted John about a mutual male friend who had "bitched" her out for not responding to the friend's text message asking her out on a date.

176. She told John, "I hate it when people hate me." John consoled her, telling her "You are TOTALLY fine"; it will ALL work out"; "you don't need him"; and "just send him an apology text or something. He will understand when he's sober."

177. John wished her a goodnight and told her "I'm glad you messaged me about this." She responded by texting, "I mean you're friends So Help Goodnight."

178. On April 21, she texted John in a playful mood about not being able to sleep and wanting mac and cheese and chicken wings. She commented "we would be hanging out right now." John responded, "I know and you have no idea how much I miss it." Jane texted back, "Same."

179. That same evening, she texted John "are we all right? All confused ** Is that sad. Or good. That can be hard sometimes you know. Its good too though. Because. It helps you. Grow. Good thing."

180. During this period of time, John texted Jane about wanting to maintain their friendship, both because he valued her as "an incredible person" and because they shared the same friends in their close-knit group.

181. Jane agreed she would be civil with John but explained that she needed to "transition you out of my life," rather than maintain their friendship. She texted "we just handle things differently."

182. She acknowledged they had both made mistakes in the relationship. ("Ahhhh all the mistakes On both sides.").

183.     In subsequent text messages, the two chatted about the latest episode of Game of Thrones, a new acquaintance Jane had met, and a concert Jane had attended.

184.     Over the summer, they did not communicate, as they had agreed in text messages at the end of spring semester to "not think" about their relationship over the summer break.

### 6.     Jane Roe Escalates Her Accusations in the Fall 2015 Term to Sexual Assault and Rape

185.     When the new school year began in the middle of September 2015, John was hopeful he and Jane could once again be friends. But, three incidents occurred that made him realize Jane was escalating to new levels of anger and accusation.

186.     First, on September 22, after 38 minutes of a friendly Facebook exchange on mundane matters, John expressed his hope to "have things resolved" between them.  Jane responded "well same."

187.     Jane then texted that their last sexual act was a "sexual assault" and stated she believed she had told him "no" to oral sex. John strongly denied both claims. Eager to resolve their differences, he apologized for asking for sex when she was "uncomfortable." He pointed out, however, that while she didn't use the word "yes" she had voluntarily initiated oral sex with him. He told her "I still didn't force you to do anything. I didn't touch you."

188.     This Facebook exchange ended with the two renewing pleasantries and with Jane recruiting John to assist her with membership tryouts for the group.

189.     The second incident occurred while John attended a football game with a friend in late September. He was physically attacked and verbally defamed by one of Jane's sorority friends, who blocked him from his seat and repeatedly shouted to everyone in the stands: "John, John-F**ing-Doe, Sexual Assault Perpetrator Himself.  How do you live with yourself?" She aggressively grabbed for his throat in a failed attempt to choke him.

37

190.    Fearing for his physical safety and shaken that Jane was spreading falsehoods about the incident, John met with Dr. Tara Sullivan, Director of the University's Office of Student Conduct and Deputy Title IX Coordinator, to seek protection from further harassment and bullying.

191.    Dr. Sullivan neglected to protect John in any way.  She informed him that, if he filed a complaint against the sorority sister, the University would investigate *him* for the sorority sister's accusation of sexual assault. She suggested he go to the University's Counseling and Psychological Services ("CAPS") if he felt he needed help.

192.    Recognizing that Dr. Sullivan and the Office of Student Conduct would not help him, he declined to pursue disciplinary action, even though he had been publicly assaulted by another student.

193.    On October 19, 2015, John's father sent an email to the University's Dean of Students, Todd Adams, stating that he and his wife were very concerned for John's "physical safety and emotional wellbeing."

194.    Dean Adams took no action to protect John from future bullying even though he had been informed of the harassment against John.

195.    The third incident occurred on October 1, when Jane ordered John to lie to his professor and "call in sick" to a required academic course in order to attend the group's membership tryouts. When John objected to lying to his professor, Jane texted that she would write his "lying letter" ("In all seriousness, I will write your lying letter"), and that if he did as she instructed she could make their friendship work ("I have a solution to work our personal friendship out and I'm very willing to take it . . . .").

196.     John refused to lie or allow Jane to lie on his behalf. Two weeks later, on October 14, Jane texted John, demanding that he take a leave of absence from the group for her "personal safety," and stating he had "raped" her. A full six months after the incident, Jane had escalated her accusation once again, now claiming she had been raped.

197.     John was horrified at this new accusation. According to Jane, because she did not say the word "yes," what had happened between them was rape. She told him (incorrectly, and as misleadingly propagated by CARE in its "Only Yes Means Consent" buttons) that, under Northwestern's Policy, "verbal consent is the only thing that's valid," even though the Policy plainly states that consent may be communicated through actions as well as words.

198.      John was astonished by this claim and pointed out how the person giving oral sex is the initiator of the encounter unless there is force or threat of force. He told her, "I never forcibly did anything." In response, Jane intimated to him that if he did not take a leave of absence things would not go well for him with the group. In the hope of placating her and ending the bullying, John tried to accept some parts of Jane's escalated version of events.

199.     These three incidents occurred in an atmosphere of escalating ostracism by friends in the group, Jane's sorority, and John's fraternity as a result of Jane's secretly but widely sharing her sexual assault accusations with them. John did not have an opportunity to defend himself before Jane's narrative took hold because he had naively complied with her request to keep the matter private.

   **E.     The University's Investigation and Jane Roe's New Accusation of Forcible Rape**

200.     Jane's efforts to remove John from the group and Jane's spreading of rumors to group members caused the group's leaders to report the dispute to their faculty advisor, who then reported Jane's accusation to the Office of Student Conduct. Dr. Sullivan, who one month earlier

39

had refused to help John when he reported the physical assault, opened an investigation into
Jane's accusation against John.

201.    On January 4, 2016, Dr. Sullivan notified John by email that her Office had
received a "report" of an "incident."

202.    The email notice contained no information about the allegations or applicable
University policies. The email told John that Dr. Sullivan would provide him with some
information when they met, but she would not provide "specifics." John would then meet with
the investigator assigned to his case. He had the option of having an advisor present, but the
advisor could not speak on his behalf, function as legal counsel, or actively participate in the
conduct process. The email instructed John to have no contact with Jane Roe.

203.    When John and his father met with Dr. Sullivan to discuss the charges, Dr.
Sullivan indirectly but clearly communicated to John that, if he decided to file a complaint
against the sorority sister, her Office would regard the complaint as "retaliation" against Jane
Roe for filing her complaint, and John would be charged with a retaliation violation in addition
to sexual assault and harassment. John did not want to appear belligerent and uncooperative,
especially since he reasonably believed the facts were on his side.

204.    Consequently, John did not file a complaint.

205.    A single Title IX investigator employed by the Office of Student Conduct was
assigned to the case. The investigator interviewed Jane and John and reviewed text and Facebook
messages provided by both parties.

206.    John told the investigator the same account set forth in this Complaint – that Jane
through her words and actions had consented to the activity and he immediately stopped the
activity when he realized she did not wish to continue. He provided the investigator with all of

40

the text and Facebook messages exchanged between the two from March 12, 2015 to the last of their messages in mid-October 2015.

207.     Jane provided the investigator with only a select group of cherry-picked text messages, including those in which she accused John of borderline sexual assault and then rape, and the October 2014 text messages in which John tried to placate her. She withheld numerous text messages, even those from the same conversation, which corroborated John's version of events.

208.     As recounted in the investigator's Report, Jane's version of events was a stark contrast to John's. It was also an escalation of what she had said earlier to John. She told the investigator that she never gives oral sex, and John knew that. She said she was sitting on the couch when John stood in front of her and hit her in the face with his penis. She claimed she told John, "We can't do this."

209.     She claimed that he pressed his penis against her mouth, that she could not move because of his positioning in front of her, and that he forced and pushed his penis into her mouth. She claimed he thrust his penis back and forth in her mouth and was choking her. He then pulled his penis out without "finishing," and said "Okay, I'm going." She claimed that at the time she knew "something weird" had just happened but she didn't know what. As John left the sorority house, she called him selfish.

210.     Because John had not received either written or verbal notice of the allegations or their factual basis, he had to piece together what Jane was accusing him of doing from the questions the investigator asked him about "force," "thrusting," and "hitting her in the face with his penis." In fact, he did not know the full extent of Jane's accusations when he was being

questioned, only learning them when he was permitted to review the investigator's Report *after* the investigation had ended.

211.    John strongly denied any sexual misconduct to the investigator. He explained that his apologies were not admissions of guilt but an effort to repair his relationship with his ex-girlfriend whose accusations had made his life intolerable.

212.    He also explained to the investigator that he had been attempting to assuage Jane and validate her feelings in some of his text messages to Jane in order to prevent further harassment and bullying.

213.    He also denied that Jane previously told him she did not like and never wanted to perform oral sex. He explained that he did not perceive that she loved performing oral sex, but on previous occasions she seemed into it.

214.    On the basis of the interviews and cherry-picked text messages, the investigator issued a Report on March 4, 2016, in which she concluded that Jane's version of events was "credible," John's version was not credible, and Jane had not consented to giving oral sex.

215.    The investigator came to this conclusion despite the many easily identifiable falsehoods in Jane's testimony. Among these were Jane's statements that she and John were not in an exclusive, intense relationship, but were in a casual "dating" relationship; that she only told a few friends about her accusations when in fact she shared her accusations widely; and that she decided to report John to "prevent him from attacking other girls," when in fact she made a report only after she was asked to by the Office of Student Conduct.

216.    The investigator made the following specific findings: (a) Jane had not uttered the words "it will work" when John asked her about positioning; (b) the oral sex took place on the couch with John standing over her, not on the ottoman; (c) John hit her in the face with his penis;

42

(d) John pressed his penis against her mouth and Jane did not voluntarily and knowingly open her mouth to perform fellatio; (e) John thrust his penis back and forth in her mouth, choking her, and then stopped and pulled his penis out of her mouth.

217.    In effect, the investigator found that John had committed forcible oral sex.

218.    The investigator concluded that Jane's behavior after the incident – ordering John to lie to his professor and stating that would be a "solution" for their friendship – was not "relevant" to the investigation.

219.    The investigator based these findings of "fact" simply on the basis of Jane's word against John's word. The investigator also concluded that the lack of references in John's text messages to the words "it will work" or to the "ottoman" was dispositive on the issue of whether Jane gave consent, even though Jane's text messages lacked any references to the "couch," "hitting her in the face with his penis," or "thrusting his penis back and forth in her mouth, choking her."

**F.    The Hearing Panel's Findings and Sanction**

220.    On March 16, 2016, John and Jane separately participated in a University Panel hearing. At the hearing, John was not permitted to hear anything that Jane Roe said to the Panel. Instead, both parties appeared before the Panel separately, at which John gave a 10-minute opening statement, answered questions from the Panel, and gave a 5-minute final statement. His time before the Panel in total lasted approximately 60 minutes.

221.    The Panel had the option of questioning the investigator. John was permitted to submit written questions to the Panel to ask the investigator. John was not permitted to hear anything the investigator said to the Panel, and was never told whether the investigator appeared before the Panel or, if so, which if any of his suggested questions were asked.

43

222.     On March 25, 2016, the Hearing Panel rendered its decision, accepting the investigator's findings of fact *in toto*.

223.     Despite the fact that this was a "he said, she said" case, the Hearing Panel, like the investigator, accepted Jane Roe's story *carte blanche* as somehow "credible" and John's as not credible, without stating why her version of events was credible.

224.     The Hearing Panel, like the investigator, excluded from consideration any and all text messages that were exculpatory of John – including the initial text messages after the incident where Jane said she wasn't angry with John, that it was a general issue of who enjoys sex more, that what had happened was because "we're just different people," and that for a full month she never suggested sexual assault.

225.     The Hearing Panel also ignored the text where Jane invited John over ("Are you dropping by"), and the scores of text messages that showed Jane continued to rely on John for weeks and months after the incident for emotional support and favors, and engaged in commonplace, everyday conversation with him. And, like the investigator, the Hearing Panel disregarded her anger about the breakup, her willingness to lie, and the change over time in Jane's story as she incorporated physically impossible allegations of forcible oral sex.

226.     The Hearing Panel failed to apply a fair and impartial standard when it concluded, in lockstep with the investigator's conclusion, that John's story was not credible *specifically because* he could not back it up with text messages, while simultaneously finding Jane credible *even though* she could not back up her story of a forcible rape with text messages, and numerous text messages John submitted called her credibility into question.

227. The Hearing Panel found John responsible for Sexual Assault (Sexual Penetration without Consent and Sexual Contact without Consent) and Sexual Harassment, and sanctioned him with one of the Policy's most severe punishments, "exclusion."

228. The sanction of "exclusion" subjected John to a minimum two-year separation from the University, after which he could reapply to the University subject to acceptance by the Office of Admission and approval from the Vice President for Student Affairs, with no guarantee of re-admission. (Ex. A at 35).

229. Exclusion also results in a permanent disciplinary record, which the University will report out to third parties, including schools to which John might try to transfer, graduate schools, prospective employers, employers, and licensing agencies. (Ex. A at 42).

230. Exclusion is a drastically more draconian sanction than the next alternative sanction of "suspension," which involved removal from the University for a minimum of one full academic quarter and possible, but not mandatory, conditions for reenrollment. (Ex. A at 35).

### G.    The Appellate Panel's Decision

231. John appealed the Hearing Panel's decision on the basis of procedural errors which substantially affected the fairness of the process and because the outcome was manifestly contrary to the weight of the information presented.

232. On May 16, 2016, the Appellate Panel upheld the Hearing Panel's findings of responsibility – but on completely different factual grounds and under a different Policy provision.

233. Contrary to the Hearing Panel's (and investigator's) finding that Jane Roe had been physically forced into oral sex, the Appellate Panel expressly found that "physical force was not used." Despite *rejecting* Jane's version of events, the Appellate Panel decided that "consent was not present due to emotional and verbal coercion" (referencing the Sexual

45

Misconduct Policy's provision that "consent . . . cannot be the result of coercion (undue pressure))."

234.    Jane had never accused John of "emotional and verbal coercion" in any of her accounts of the incident (and indeed, scores of text messages show that, if any emotional coercion was present in the relationship, it was Jane who wielded it, not John). The Appellate Panel appears to have based its "coercion" finding on the undisputed fact that John verbally requested oral sex from his girlfriend more than once.

235.    Neither of the terms "coercion" or "undue pressure" was defined in the University's 2014-2015 Handbook and the terms "emotional coercion" and "verbal coercion" did not appear in it. Without any basis in the University's extensive written policies and procedures, the Appellate Panel decided on its own that asking more than once for a sexual activity between couples in an exclusive relationship constitutes coercive, non-consenting sex.

**H.    The Investigator, Hearing Panel, and Appellate Panel in John's Case Breached the University's Written Promises to Conduct a Fair and Impartial Process, Their Findings and Conclusions Were Not Supported by a Preponderance of the Evidence as Required, and Demonstrated Pervasive Gender Bias in Violation of Title IX**

236.    The Sexual Misconduct Policy used in John's case contained explicit contractual promises guaranteeing a fair and impartial process.

237.    The Policy provided that "[a]ll who participate in the [student conduct process] … have the right[ ] . . . [t]o a prompt, fair and impartial investigation and resolution." (Ex. A at 131).

238.    The Policy further provided that "[t]he University's investigative and resolution processes of reports of violations of this policy will be prompt, fair and impartial," and that its

46

procedures "are intended to afford a prompt response … to maintain privacy and fairness consistent with applicable legal requirements ...." (Ex. A at 87, *see also id.* at 128, 131).

239.    The Policy acknowledged that "[c]omplaints of sexual misconduct . . . can sometimes raise novel issues and involve competing interests" and that the University "reserves discretion to take reasonable actions to address those issues in a manner consistent with the spirit of this policy, and which preserves fairness for both parties . . ." (Ex. A at 87).

240.    The Policy promised that students involved in the Sexual Misconduct process were entitled to "have the allegations resolved by hearing officers, panel members, and investigators who are properly trained and who are able to act impartially." (Ex. A at 131).

241.    The University also promised to apply the Code's standards of conduct "equally to all regardless of the sex, gender, sexual orientation, gender identity, or gender expressions of any of the individuals involved." (Ex. A at 62).

242.    The University promised to comply with Title IX, the federal law which "prohibits discrimination (including sexual harassment and sexual violence) based on sex in the University's educational programs and activities." (Ex. A at 70).

243.    Finally, the Policy "strongly encourage[d] its community members to communicate – openly, honestly and clearly – about their actions, wishes, and intentions when it comes to sexual behavior, and to do so before engaging in intimate conduct." (Ex. A at 63).

244.    The investigative and resolution processes used in John's case breached these explicit contractual promises in every phase of the process.  The process was neither fair nor impartial.

245.    The investigator's and Hearing Panel's findings of fact and conclusions were not supported by the required preponderance of the evidence and demonstrated a pervasive gender

47

bias that resulted in a predetermined outcome in favor of the female complainant in disregard of evidence to the contrary or the complete lack of evidence.

### 1. The Investigator's and Hearing Panel's Contractual Breaches and Title IX Violations

246.    Both the investigator and Hearing Panel, following the mandate to "believe the survivor," accepted Jane's account without question and without stating why her version of events was "credible" and John's was not in a case involving competing "he said, she said" testimony.

247.    The fairness of the investigation and hearing depended at the outset on the objectivity of the single investigator.  Upon information and belief, the single investigator in John's case, Colleen Johnston, came to her position at Northwestern with a bias against accused male students. She received a master's degree in Gender/Cultural Studies at Simmons College, a program dedicated to analyzing "systems of power and privilege." (https://www.simmons.edu/~/media/Simmons/Admission-and-Financial-Aid/Grad-Admission/Documents/GCS-Booklet.ashx?la=en). She was hired by Joan Slavin, the Title IX Coordinator, whose anti-male bias was documented at length by Prof. Kipnis in her 2017 book, *Unwanted Advances*.  Johnson was the investigator who investigated a male adjunct professor for sexual harassment after an unidentified third party complained about a blog post that the professor had written before coming to Northwestern.  After Johnston contacted him, the professor left his teaching post mid-semester rather than submit to Johnson's "baseless witch hunt." (See https://dailynorthwestern.com/2016/01/27/campus/former-northwestern-adjunct-professor-says-he-was-fired-over-false-sexual-harassment-allegation-2/)

248.    Both the investigator and Hearing Panel purported to use text and Facebook messages (or the *absence* of text and Facebook messages) to tilt the credibility determination in

Jane's favor. But they applied a double standard in reviewing the messages, excluding from consideration any of the scores of messages that corroborated John's version of events, ignoring messages that contradicted Jane's version and undermined her credibility, and using the *absence* of corroborating messages to make findings of fact and credibility determinations against John but not against Jane.

249.    They ignored the context of an exclusive relationship, how angry and embarrassed Jane was by the public breakup, and how eager John was to placate Jane throughout the relationship in order to resume normal life, all of which were reflected in texts ignored by the investigator and Hearing Panel.

250.    The investigator and Hearing Panel disregarded messages showing the escalation of accusations, which evolved from calling John "selfish" to accusing him of "borderline sexual assault," then "sexual assault," then "rape" involving physically improbable allegations of forcible oral sex in the absence of any restraint, intimidation, or threat of harm.

251.    They discounted as irrelevant Jane's statement to John in writing that if he lied to his professor she would make their friendship work again. These texts are highly relevant to assessing Jane's credibility. Implicit in this offer is the reverse: a reprisal if John did not comply. The texts showed that Jane was treating the friendship – and implicitly her accusations of sexual assault and rape – as a bargaining chip that she could manipulate to her own ends.

252.    Both the investigator's Report and Hearing Panel outcome letter are replete with examples of unquestioning, one-sided acceptance of Jane's story, skewed treatment of the evidence, and skewed reasoning to justify the findings. Six non-exhaustive examples follow.

253.    **First**, both the investigator and the Hearing Panel concluded that the oral sex took place on the couch with John standing over Jane, because there was no reference in any of John's

49

or Jane's text or Facebook messages that supported John's testimony they moved to the "ottoman" where he and Jane discussed "positioning." Jane did not mention the "couch" or John "standing over her" in any of *her* messages, yet this omission did not lead the investigator or Hearing Panel to discredit her testimony.

254. Had they been fair and impartial, the fact that the ottoman, the couch, discussing positioning, and John standing over her were not discussed by *either* party should have led them to conclude that they could draw no inferences *either* way from the text and Facebook communications.

255. **Second**, the investigator and Hearing Panel applied the same double standard to Jane's story that John hit her on the face with his penis. John denied the accusation. Until Jane told this story to the investigator, she had never accused John of this act in any of her dozens of text and Facebook messages after the incident.

256. In spite of acknowledging the *absence* of messages confirming Jane's story, the investigator and Hearing Panel concluded Jane was credible and John was not, simply on the basis of Jane's word. They had no *evidentiary* basis for this finding, and it did not meet the requisite preponderance of the evidence standard.

257. **Third**, on the issue of consent, the investigator and Hearing Panel continued to cherry-pick text and Facebook messages to find Jane credible and John not credible.

258. The investigator and Hearing Panel concluded that Jane did not give "verbal consent"; specifically, they found that John did not ask "Will this work" and Jane did not say the words "It will work." They made this purported "factual" finding on the basis that John did not reference that Jane said "It will work" in his text and Facebook communications.

259.    The Hearing Panel reasoned that if Jane had provided consent in this way John would have referenced that communication in his texts with Jane.

260.    The investigator and Hearing Panel also found that Jane did not give consent through her "actions"; specifically, they found that John and Jane did not move to the ottoman; they did not discuss positioning; and she did not open her mouth voluntarily and commence fellatio. They made these purported "factual" findings *not* on the basis of *evidence* but on the basis that John did not make these specific references in his text and Facebook communications.

261.    The Hearing Panel reasoned that if these actions occurred as John stated to the investigator, he would have referenced them in his text communications with Jane "to prove to her that the actions that occurred were not sexual assault or rape."

262.    In effect, the investigator and Hearing Panel expected John to *anticipate* that Jane would be filing a complaint against him and expected him to craft his text messages to create a paper trail that would establish his innocence in the ensuing investigation.

263.    This flawed reasoning imposes an impossible standard of proof on an accused student. His word is never sufficient to cast doubt on the accuser's word; he must also have created a contemporaneous "record" that will exonerate him later on.  By applying this standard, the investigator and Hearing Panel improperly presumed John's guilt and shifted the burden of proof on him to prove his innocence. These findings had no *evidentiary* basis and failed to satisfy the requisite preponderance of the evidence standard.

264.    The investigator and Hearing Panel also ignored the text messages immediately following the incident that showed Jane did not accuse him of anything remotely suggesting forcible sex; to the contrary, she summed up the evening by telling John "we're just different

people," and told him she *wasn't angry* but thinks a lot about how he "benefits more" in the relationship.

265.     The investigator and Hearing Panel disregarded the context and evolution of the allegation – it came only after the embarrassing breakup; it became more extreme over time; Jane had demonstrated a willingness to lie; and Jane had a motive to change the story so as not to look like a liar in front of her friends after months of using her position of power in the group to slander and bully John.

266.     **Fourth**, the investigator and Hearing Panel credited Jane's story that John "pressed" his penis against her mouth and thrust it back and forth until he stopped, while acknowledging that they were not able to determine whether John "jabbed" and "forced" his penis into her mouth, as Jane recounted in the investigation.

267.     They made this credibility determination solely on the basis of Jane's word, concluding without evidence that she must be telling the truth. Had they been fair and impartial, they would have found that the evidence was at best inconclusive in a situation where it is word against word.

268.     The investigator and Hearing Panel also failed to exercise common sense in their evaluation of Jane's story:  how and why would John "jab" and "force" his penis into her mouth and move it back and forth with an unwilling partner, who had the capacity to bite down, only to pull out a minute later (as Jane claimed). Jane never alleged that John physically restrained her, threatened her with harm, or intimidated her to get her to open her mouth.

269.     Had they been fair and impartial, the investigator and Hearing Panel would have concluded that Jane's entire forcible rape story was an improbable fabrication, if not physically impossible.  It is simply not possible without restraint of the upper body and head to force a

penis into an unwilling person's mouth, because the person's mouth is closed and her head is free to move in any direction.

270. **Fifth**, the investigator and Hearing Panel concluded that John's texts to Jane taking responsibility for some of her accusations were admissions of guilt rather than attempts to assuage and validate Jane's feelings, as John had explained.

271. The reason given by the Hearing Panel for this finding was that these communications "served to debate what occurred between the two" and "did not serve to assuage [Jane's] feelings." This reasoning is illogical and unfair. If John's statements were a "debate" between the two about what happened, they logically could not be admissions of guilt.

272. The investigator and Hearing Panel disregarded Jane's relationship history with John as the context in which John's supposed admissions needed to be understood. At a minimum, the investigator and Hearing Panel should have asked to see the messages and texts from throughout the relationship that are replete with examples of Jane's gas-lighting John (delegitimizing him, causing him to question his own perception).

273. By failing to investigate, and assuming Jane must have been the victim, the investigator and Hearing Panel upheld false gender stereotypes and displayed gender bias, wherein only females can be the victims and males the perpetrators.

274. The investigator and Hearing Panel also failed to consider that Jane claimed that John had "raped" her only after she looked up the definition of rape, and misunderstood Northwestern's definition of consent as requiring a verbal "yes" when consent can also be communicated through actions.

275. **Sixth**, the investigator and Hearing Panel gave no weight to the fact that Jane withheld key text and Facebook messages, even from the same conversation, while John produced a complete set of text and Facebook messages during the investigation.

276. The texts Jane omitted cast significant doubt on her accusations and credibility. These include the texts immediately after the incident in which John apologized for not realizing she was angry that night and she responded "I wasn't," and in which Jane told him he should not feel badly because "we're just different people." They include the texts in which she asked John whether he was "dropping by" and told him to "Feel better" when he was not feeling well.

277. Jane omitted the texts that showed she sought John out for relationship advice, favors, and emotional support in the weeks following her "borderline sexual assault" accusation, and where she acknowledged "we just handle things differently" and admitted they both had made "mistakes" in the relationship ("Ahhh all the mistakes On both sides"), a far cry from accusing John of committing a forcible sexual act.

278. She also omitted the text where she admits, after the breakup, that "in a relationship in which I felt like you benefited most of the time, I'd like to feel like I win this time around." And, she omitted the texts in which she asked John to lie and stated she would "work our personal friendship out" if he did.

279. Had they been fair and impartial, the investigator and Hearing Panel would have concluded that Jane withheld these messages because the messages discredited her story.

### 2. The Appellate Panel's Contractual Breaches and Title IX Violations

280. The Appellate Panel rejected the investigator's and Hearing Panel's finding that Jane had been physically forced into oral sex, as Jane had claimed in the investigation. The Appellate Panel explicitly found that "physical force was not used."

281.    The Appellate Panel did not believe that Jane's forcible rape story was supported by a preponderance of the evidence. But, rather than reversing the Hearing Panel's decision, the Appellate Panel upheld it on different grounds.

282.    It concluded that "consent was not present due to emotional and verbal coercion" (referencing the Policy's provision that "consent . . . cannot be the result of . . . coercion (undue pressure))." The Panel appears to have defined "coercion" in John's case as asking more than once for sexual activity.

283.    The Appellate Panel's reasoning and decision breached its contractual duty of fairness and impartiality and violated Title IX for at least seven reasons.

284.    **<u>First</u>**, had the Appellate Panel been fair and impartial, it would have reversed the Hearing Panel's finding. Or, at the very least, it should have instructed the Hearing Panel to hold a new hearing on the new, alternative Policy violation of "emotional and verbal coercion" and allow the parties to supplement the record with testimony and evidence pertaining to the new charge.

285.    That procedure is expressly permitted in the Code (stating the Appellate Panel "may refer the case back to the . . . Panel for further review" and "may recommend that alternate policies or sanctions be considered") (Ex. A at 147).

286.    Had the Appellate Panel referred the case back to the Hearing Panel, as it should have, John would have supplemented the record with text and Facebook messages from the entire relationship showing that if anyone exerted emotional and verbal coercion it was Jane, not John.

287.    Texts sent by Jane to John *before* the March 13 incident show that she was quick to criticize John, exaggerated his supposed shortcomings, and was excessively judgmental.

288.    For example, she texted:  "you're so lame"; "Honestly how do you function as a human?"; "It's ok but I hate you"; "You're weird": "you're a mess"; "Honestly I hate you. . . VERY bitter Bitter with a side of hatred But REAL hatred"; "Ok bye you suck."

289.    Texts sent by John to Jane *before* the incident show that John was constantly pained by Jane's criticisms, frequently apologized, and took the blame.

290.    For example, he texted: "Why can't you be nice like this all the time?  I guess I'll take what I can get"; "Don't look disgusted every time you see me"; "just compliment me one time"; "I just want you to say nice things to me"; "why are you taking this out on me"'; "sorry for repeating myself Never again"; "I FUCKED UP"; "I SUCK": "I honestly hate myself sometimes"; "What do you want me to do . . . I'm trying so hard to do everything right and I sometimes can't"; "I would really appreciate it . . . that you give me one more chance"; "getting you more good/Food"; "I don't have food for u tonight I'm sorry"; "Just please tell me something reassuring so I stop overthinking this . . .  how you feel about me"; "I'm sorry!!!!"

291.    Jane tellingly wrote to John:  "You're way nicer than I am" and forwarded to him a link to "17 Terrible Valentines" with the note "like omg this is literally how I talk to you." Two characteristic valentines were "you're fine, I guess," and "Let me toy with your heart."

292.    John was never allowed to present this new evidence demonstrating that Jane, not John, was emotionally coercive throughout the relationship to rebut the new charge raised for the first time by the Appellate Panel.

293.    **Second**, the Appellate Panel breached the provision in the Code requiring that accused students "be given notice of the allegations before the hearing and to have the allegations explained clearly and fully." (Ex. A at 131).

294.     The University did not give notice, and did not clearly and fully explain, the new charge of "emotional and verbal coercion" before the hearing. John learned about it for the first time when the Appellate Panel issued its written decision denying his appeal, which ended the case and resulted in his immediate exclusion.

295.     **Third**, the Appellate Panel's finding flies in the face of the Sexual Misconduct Policy's admonition to students to "communicate – openly, honestly and clearly – about their actions, wishes, and intentions when it comes to sexual behavior, and to do so before engaging in intimate conduct." (Ex. A at 63).

296.     That is exactly what John did – communicate to his partner a proposed sexual activity – and for that alone, he was labeled a sexual offender by the Appellate Panel and punished with a minimum two-year exclusion.

297.     **Fourth**, the Appellate Panel made up out of whole cloth a standard of sexual conduct that ignores the commonplace, everyday experience of sexual partners, which frequently involves sexual give and take, discussions of sexual preferences, and partners asking more than once and changing their minds about proposed sexual activity. No reasonable partner would consider a partner asking more than once for a sexual activity as emotional and verbal coercion.

298.     **Fifth,** the ordinary dictionary definition of "coercion" (which the Appellate Panel should have considered as guidance in defining the term) makes clear that coercion involves force, the threat of force, or intimidation that instills fear in an unwilling person to comply with another person's demands.

299.     The Merriam-Webster Dictionary defines "coercion" as "the use of express or implied threats of violence or reprisal (as discharge from employment) or other intimidating

behavior that puts a person in immediate fear of the consequences in order to compel that person to act against his or her will."

300.    The Cambridge Dictionary defines "coercion" as "the use of force to persuade someone to do something that they are unwilling to do."

301.    Moreover, the term "coercion" in the 2014-2015 Handbook comes at the end of a long list of extreme behaviors (force, violence, physical restraint, presence of a weapon, threats, indications of intent to do harm, intimidation, extortion, menacing behavior, bullying) and should have been analyzed and applied in that context.

302.    **Sixth**, in the September 2016 Revised Policy on Sexual Misconduct, the University made clear that coercion involves persistent conduct that induces fear. It clarified the definition of "voluntary consent" by eliminating the term "undue pressure" and defining the term "coercion" as "severe or persistent pressure causing fear of significant consequences from the respondent if one does not engage in sexual activity." (Ex. D at 3).

303.    This clarification in the definition would have precluded the Appellate Panel's finding against John, which was based on his conduct in verbally requesting a sexual activity more than once. That conduct on its face lacked the elements of "***severe and persistent pressure***" that caused Jane to "***fear … significant consequences***" from John if she did not comply.

304.    The record in the case, including the investigator's Report, text and Facebook messages, and Hearing Panel outcome letter did not include any finding or evidence even remotely suggesting that John's verbal requests on March 13 were "severe and persistent pressure" that caused Jane to "fear … significant consequences" if she did not comply.

305.    **Seventh**, the Appellate Panel's "emotional and verbal coercion" finding cannot satisfy the definition of sexual harassment used in John's case, which required sexual conduct

that created a "hostile, intimidating or offensive academic . . . environment" or was "sufficiently

severe, persistent, or pervasive to limit a person's ability to participate in or benefit from an

educational program or activity." (Ex. C at 35).

306.    Merely asking verbally for a sexual activity more than once in an exclusive

relationship *on its face* does not meet either of these requirements.

307.    The record in the case, including the investigator's Report, text and Facebook

messages, and Hearing Panel outcome letter did not include a finding or evidence even remotely

suggesting that John's actions on March 13 created a "hostile or offensive academic or working

environment" or was "severe, persistent or pervasive."

### 3.    After John's Case, Northwestern Clarified Three Other Crucial Provisions in the Revised Policy.

308.    In addition to the clarification in the Revised Policy with respect to "coercion"

and "undue pressure," the University made three other changes in the "Complaint Resolution

Process" section of the Revised Policy. (Relevant excerpts from this section of the Revised

Policy are attached hereto as Exhibit E.)

309.    **First**, this section of the Revised Policy eliminates the sentence requiring the

Hearing Panel to "accept" the investigator's findings unless the accused presented "significant

information" during the hearing. (*Cf.* Ex. A at 144 with Ex. E at 12, attached hereto).

310.    That clarification enables the Hearing Panel to make its own, independent

assessment of the investigator's findings and credibility determinations, which it was not

permitted to do when it decided John's case.

311.    **Second**, the Notice provision in the Revised Policy entitles the respondent to

notice of the alleged misconduct, which "will typically include a brief description of the alleged

misconduct, a list of any University policies allegedly violated, and a description of the steps toward resolution." (Ex. E at 6).

312.    John received none of this information in the January 4, 2016 Notice he received from the Office of Student Conduct.

313.    In addition, the Revised Policy gives the respondent "an opportunity to respond" to the Notice. (*Id.*) John was not accorded that opportunity, and in fact, only learned the full extent of Jane's accusations when he reviewed the investigator's Report after the investigation had ended.

314.    **Third**, the Revised Policy requires the University to post on its public website "[a] list of investigators, panel members, and appeal reviewers who may make findings in sexual misconduct matters," and gives the parties "the opportunity to raise the issue of a potential conflict of interest or perceived bias within 2 days of their initial meeting with a Title IX staff member." (Ex. E at 3).

315.    John never had that opportunity. He was told the identities of the Hearing Panelists only at the beginning of the hearing.

316.    Had the University informed him of their identities at the beginning of the investigation, John would have known that one of his Hearing Panelists reported directly to the Director of the Office of Student Conduct, the Office which investigated and charged John, and he would have raised this conflict of interest at the beginning.

317.    As it was, John learned of the conflict after the hearing and objected to it in his appeal.  The Appellate Panel rejected his argument because he had not raised the conflict at the hearing.

I. **Northwestern's Office of Student Conduct Failed to Enforce the Code's Civility and Mutual Respect Provision and Violated John's Right to be Treated Equally When It Failed to Investigate His Assault by Jane Roe's Sorority Sister**

318.    In addition to the Sexual Misconduct Policy, the University's Code of Conduct prohibits community members from engaging in "disorderly conduct," defined in relevant part as "[a]ction that significantly disturbs or endangers the peace or comfort of others or the community."  (Ex. A at 27).

319.    The Code also prohibits conduct that violates provisions on civility, mutual respect, and unacceptability of violence on campus.  Such prohibited conduct includes "[d]emeaning, intimidating, threatening, or violent behaviors that affect the ability to learn, work, or live in the University environment [which] depart from the standard for civility and respect." (Ex. A at 102).

320.    "Violence" is defined as "behavior that causes harm to a person . . . or causes fear for one's safety or the safety of others.  Examples of violent behavior include physical contact that is harmful and expression of intent to cause physical harm." (*Id.*)

321.    In the Code's Statement of Community Principles and Values, the University states that "[c]ivility and respect are expected behaviors," and that "'[d]o no harm to others' is a nonnegotiable value." (Ex. A at 4, 5).

322.    In the Code's Policy Statement on Student Rights and Responsibilities, the University promises to "not discriminate or permit discrimination by any member of its community against any individual on the basis of . . .  sex."  (Ex. A at 7).

323.    This section of the Code also provides that "every member of the community has the responsibility to conduct him or herself in a manner that does not violate the rights and

freedoms of others and has the responsibility to recognize the principles within this statement of policy." (Ex. A at 9).

324.    The University retains its "right to take actions to protect the health and safety of the University community and its members, guests, and visitors." (Ex. A at 6).

325.    The Office of Student Conduct failed to enforce the Code of Civility and Mutual Respect and failed to treat John and Jane equally when it was indifferent to *his* report of being physically assaulted and subjected to demeaning, threatening behavior by Jane's sorority sister, but opened a full investigation into Jane's allegation of sexual misconduct against John when it was reported to the Office of Student Conduct.

326.    When John first reported the physical assault to Dr. Sullivan (which preceded Jane Roe's report), Dr. Sullivan told him that if he chose to file a formal report her Office would also open an investigation against *him* based on the sexual assault accusation made by the sorority sister.

327.    When John's parents expressed their concern about the assault to Dean Adams, the University did nothing.

328.    When John met with Dr. Sullivan after receiving notice of Jane's report, Dr. Sullivan indirectly but clearly communicated to John that if John decided to file a complaint against the sorority sister, the University would regard the complaint as "retaliation" against Jane and would charge him with a retaliation violation in addition to sexual assault and harassment.

329.    Nothing in the Code contemplates that a demeaning, public accusation made by an assailant during a physical attack against a student on University property requires the University to open two investigations – one into the assailant's physical attack, and another into the assailant's accusation against her victim – and nothing in the Policy permits the University to

use an implied threat of a retaliation charge to intimidate a student from asserting his rights under the Code.

330.    By failing to protect a student from the threat of physical assault and bullying behavior, by tying the opening of an investigation of John's report of physical assault to the opening of an investigation into his assailant's accusation, and by using an indirect but clear threat of a "retaliation" charge should he formally file a complaint, the University violated its obligations under the Code of Conduct.

331.    By contrast, the University took an active role with respect to Jane's allegation. The Office of Student Conduct contacted Jane after the accusation was reported to the Office. Upon information and belief, Dr. Sullivan did not warn Jane that if she filed a formal complaint the University would open an investigation into John's complaint, and no such investigation occurred.

332.    The disparity in how the University treated the parties' claims demonstrated bias against male students who are victims of violence and uncivil conduct *and* male students who are accused of sexual misconduct by female students.

### COUNT I
**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*)**

333.    The foregoing allegations are incorporated by reference as if fully set forth herein.

334.    Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*, provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

335.    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.  Northwestern is a recipient of federal funds and, therefore, is bound by Title IX and its regulations.

336.    Northwestern discriminated against John and deprived him of the benefits of its education program on the basis of sex through its discriminatory, gender-biased implementation of its Sexual Misconduct Policy and by imposing an excessively punitive, unjust punishment of "exclusion" from the University as a result of that Policy.

337.    Under Title IX, schools must "[a]dopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by [Title IX or its regulations]." 34 C.F.R. § 106.8(b).  Both the Department of Education and Department of Justice have set forth this requirement by way of regulation. *See* 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice).

338.    In 2001, the Department of Education's Office for Civil Rights, the office that administratively enforces Title IX, promulgated regulations pursuant to notice-and-comment rulemaking in a document entitled "Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").

339.    Title IX's regulations, including the 2001 Guidance, have the force and effect of law, because they affect individual rights and obligations and were the product of note-and-comment rulemaking.

340.    OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable. . . ." *Id.* at 20. These elements apply to private and public colleges and universities and include:

- "Notice to students . . . of the [school's] procedure";

-  "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process."

*Id.* .

341.   OCR's 2001 Guidance further stated that "[a]ccording due process to both parties involved, will lead to sound and supportable decisions." *Id.* at 22.   Title IX's "due process" requirement applies to both state and private colleges and universities.  *Id.* at 2, 22.

342.   Northwestern's Sexual Misconduct Policy as conceived and implemented by the University and the Office of Student Conduct was deliberately designed to favor the female accuser and disadvantage the accused male by, among other things, eliminating from the process fundamental procedural safeguards for the accused set forth in Title IX.

343.   The Sexual Misconduct Policy's procedurally deficient process was intended to subject male students to less favorable treatment than female students, because accused students in sexual assault cases are overwhelmingly, if not always male, and the Policy on its face and as implemented in John's case deliberately accorded unequal treatment to John and other accused male students.

344.   The Sexual Misconduct Policy was systemically inequitable toward accused students (who are overwhelming male). Among the many procedures that unfairly disadvantaged accused male students, the Sexual Misconduct Policy eliminated a full hearing process, in which both parties had an equal opportunity to question and confront each other and witnesses and to present evidence in front of an impartial and independent Hearing Panel.

345.    In its place, the University hired a "sole investigator" who (according to a University administrator involved in creating the Sexual Misconduct Policy) would be tasked with investigating "all sexual misconduct . . . and help the voices of students and survivors be heard." Thus, the University openly acknowledged that it hired a "sole investigator" whose intended role was to benefit "survivors."

346.    Under the Sexual Misconduct Policy, the Hearing Panel was required to accept the investigator's findings of fact and credibility determinations unless the accused was somehow able to present "significant information" during the hearing. Given the extremely limited format of the hearing, lacking in examination, cross-examination, or presentation of evidence, the accused student's opportunity to overcome the Hearing Panel's deference to the investigator's findings was nonexistent.

347.    Accused students were not entitled to "notice of the allegations" until sometime "before the hearing." Although the accuser knew the charges and the substance of her allegations from the beginning of the case, the accused was left in the dark. In John's case, he only learned the full extent of Jane's allegations when he received a copy of the investigator's Report *after* the investigation had ended.

348.    The investigator and Hearing Panel accepted Jane's account *carte blanche*, finding her story credible, and John's story not credible, simply on the basis of her word and cherry-picked text and Facebook messages supplied by Jane.

349.    They applied a double standard in reviewing the parties' text and Facebook messages, excluding from consideration all of John's messages that supported his credibility and undermined Jane's credibility, and showed her willingness to lie, that her accusation came only after a hurtful breakup of their relationship, and that her story changed and escalated over time to

66

include physically impossible allegations of forced oral sex that the Appellate Panel acknowledged did not happen ("physical force was not used").

350.    Even more egregiously, the Appellate Panel found John responsible for sexual assault and sexual harassment on new grounds and on the basis of a new charge never presented to John before – *i.e.*, "emotional and verbal coercion," terms that were not defined in the Sexual Misconduct Policy.

351.    He was given no opportunity to rebut the new charge in a new hearing; instead, the Appellate Panel summarily decided the case against John on its new finding, ordered his immediate two-year exclusion, and closed the case.

352.    The Sexual Misconduct Policy's deliberately skewed treatment of accused male students has been the subject of widespread criticism within the University, including from Professor Kipnis, who wrote that the University's then-new Sexual Misconduct Policy was obsessed with "helpless victims" ("endangered damsels") and "powerful predators" (males) and fostered a campus climate that subjects accused male students to an "underground world of secret tribunals and capricious, medieval rules."

353.    In a particularly Kafkaesque moment, Prof. Kipnis was charged with "retaliation" and investigated merely on the basis of her criticisms of the Policy.

354.    The Sexual Misconduct Policy used in John's case was created under the supervision of the Office of Student Conduct with input from the Women's Center, which saw itself as "instrumental" in creating the Policy, and CARE – two University Offices which advocate for University policies and procedures that put the "needs and rights" of female "survivors" first, at the expense of the needs and rights of male "perpetrators."  Their web pages are indicative of intentional and institutional gender bias.

355. The University's web pages devoted to explaining the Sexual Misconduct Policy have adopted the same gender-biased "survivor" rhetoric used by these two advocacy Offices.

356. Statements made by Dr. Sullivan and other University officials, in which they explained the University's goal in creating the Sexual Misconduct Policy to accommodate accusers and praised the hiring of a "sole investigator" as a "win" for "survivors," also demonstrate intentional, institutional gender bias.

357. Dr. Sullivan and Dean Adams were aware of their mishandling of John's report of his physical assault by Jane's sorority sister and they knew that the Sexual Misconduct Policy used in John's case had been deliberately crafted to be inequitable to accused male students.

358. These University officials had actual knowledge and notice of the University violations of Title IX in John's case requiring an "adequate, reliable and impartial investigation" and "due process to both parties involved."

359. They selectively enforced the University's policies and procedures to treat John (an accused male) differently from Jane by indirectly but clearly communicating to John that, if he brought a complaint against Jane's sorority sister for her physical assault of him, they would bring a retaliation charge against him in addition to Jane's sexual misconduct allegations.

360. These actions were intended to deliberately treat John (as an accused male) less favorably than Jane (as an accusing female).

361. These University officials had the authority to stop the disparate treatment and wrongdoing. By doing nothing, they and the University were deliberately indifferent to John and similarly-situated male students charged under the Sexual Misconduct Policy.

362. Statistical data at Northwestern and comparable universities further confirms the University's bias.

363.    In 2015-2016, the same year that John was found responsible, the University's Hearing Panels on student sexual misconduct matters found students responsible in 8 out of 9 cases (*i.e.*, 88% of the cases).  The Hearing Panel sanctions in these cases resulted in 7 expulsions or exclusions and 1 suspension. (http://www.northwestern.edu/sexual-misconduct/docs/Annual%20Data%20Report%202015-2016%2012-20-16.pdf).

364.    This high rate of responsibility and severe punishment contrasted with similar schools.  In 2014-2015, just miles away at the University of Chicago, there were panel hearings for 6 students charged with sexual misconduct, and of those, only 2 of the 6 students (33%) were found responsible and were suspended (there were no expulsions or exclusions).

365.    Similarly, at Yale University (a school that entered into a voluntary resolution agreement with OCR in 2012 to make sure that complaints of sexual misconduct were taken seriously), only 2 out of 8 students (25%) were found responsible in sexual misconduct panel hearings in 2015 and expelled or suspended.

366.    Northwestern has a 47% higher rate of findings of responsibility than other colleges and universities that have consulted with the National Center for Higher Education Risk Management (NCHERM), a leading consulting firm that partners with higher educational institutions to institute victim-centered policies about sexual assault on college campuses.

367.    In responding to the concerns of colleges and universities as to whether their 60% finding of "no violation of policy" is "somehow … wrong, or not as it should be," NCHERM noted its "concerns with the types of allegations being made on college campuses," and remarked that "more [students] are coming forward, and … education brings allegations of all kinds … some based strongly in fact, others that are baseless, and most that are somewhere in

between." (2017 NCHERM Group Whitepaper, https://www.ncherm.org/wordpress/wp-content/uploads/2017/04/TNG-Whitepaper-Final-Electronic-Version.pdf at 15).

368.    When comparing Northwestern's Clery Report from 2014 to 2015, the number of reported rapes went up in 2015 by more than 166% from 3 to 8. Compared to Northwestern's high rate of reported rapes in 2015, the American Association of University Women reported that 89% of colleges reported zero rapes in 2015.

369.    All of these comparative statistics suggest that in 2015-2016 when John's case was investigated and decided, Northwestern (like other "overzealous" schools across the nation) had embraced a "victim-favoring" process in sexual misconduct cases that intentionally treated female complainants more favorably than accused male students.

370.    The outcome of Northwestern's flawed proceeding against John was clearly erroneous, and was motivated on the basis of sex. The University's implementation of the Policy was based on archaic assumptions and stereotypical notions of the sexual behavior of male and female students – *i.e.*, accused male students are presumed to be sexual aggressors and perpetrators and accusing female students are presumed to be "survivors" and "victims" of sexual assault.

371.    The University's conduct was so severe, pervasive, and objectively offensive that it denied John equal access to education that Title IX is designed to protect.

372.    The University punished John with one of its most severe sanctions – a two-year exclusion – with little evidence and as a result of a process that contains virtually no procedural safeguards for accused male students and is permeated with gender bias.

373.    As a direct, proximate, and foreseeable consequence of Northwestern's Title IX violations, John has been stripped of his ability to continue his education at Northwestern for a

minimum of two years, and his academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

374.     As a result of the foregoing, John is entitled to injunctive relief and damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT II
### (Breach of Contract)

375.     The foregoing allegations are incorporated by reference as if fully set forth herein.

376.     This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

377.     At all times relevant hereto, a contractual relationship existed between Northwestern and John through John's matriculation as a student at Northwestern, and through Northwestern's policies and procedures governing the student conduct process, including but not limited to the policies and procedures contained in the Student Handbook, the Sexual Misconduct Policy, the Student Code of Conduct, and related terms and provisions in bulletins, circulars, and on-line website information and regulations made available to John as a tuition-paying student.

378.     On his part, John fully performed under his contracts with Northwestern.

379.     Northwestern, through its agents assigned to John's case, was required to act in accordance with the aforementioned policies and procedures in addressing Jane Roe's allegations against John, and in conducting its investigation, Panel Hearing, and Appellate review.

380.     For all the reasons set forth above, Northwestern has materially breached its contracts with John by failing to comply with the aforementioned policies and procedures in the course of its investigation and adjudication of John's case, and by arbitrarily and capriciously disregarding its contractual duties throughout the proceedings.

381.     Apart from breaching its express contractual obligations, Northwestern breached and violated the covenant of good faith and fair dealing implied in its contracts with John by acting arbitrarily, capriciously, and in bad faith throughout John's student conduct process, by acting in a manner inconsistent with John's reasonable expectations of a fair and impartial process, by depriving him of the benefit of his bargained-for education, and by meting out a grossly disproportionate sanction of a two-year exclusion from the University.

382.     As a direct, proximate, and foreseeable consequence of Northwestern's numerous material breaches, John has been stripped of his ability to continue his education at Northwestern for a minimum of two years, and his academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

383.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## COUNT III
### (Estoppel and Reliance)

384.     The foregoing allegations are incorporated by reference as if fully set forth herein.

385.     This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

386.     In the event the Court finds that the promises and representations Northwestern made to John in the aforementioned policies and procedures do not constitute legally valid and enforceable contracts, John pleads in the alternative a claim for equitable estoppel.

387.     Northwestern made an unambiguous promise to John that by enrolling as a student the University would accord him a fair and just process to resolve any allegations of a violation of the Code or Policy; John relied on such promise when he made the decision to enroll at Northwestern; John's reliance was expected and foreseeable by Northwestern; and John reasonably and justifiably relied to his detriment on the promise when he was subjected to a process that violated the promise.

388.     As a direct, proximate, and foreseeable consequence of the above-identified conduct, John has been stripped of his ability to continue his education at Northwestern for a minimum of two years, and his academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

389.     As a result of the foregoing, John is entitled to specific performance or in the alternative to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

### COUNT IV
### (Negligent Infliction of Emotional Distress)

390.     The foregoing allegations are incorporated by reference as if fully set forth herein.

391.     This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

392.     Northwestern owed John a duty of reasonable care in providing a fair and impartial process for investigating and adjudicating the charges against him and from protecting him from foreseeable harm.

393.     By participating in the Sexual Misconduct Policy's investigatory process and adjudication, John reasonably relied upon Northwestern's duty to protect him from harm.

394.     The University breached its duty of care to John in multiple ways, including but not limited to the following:

(a)     instructing all members of the Northwestern community to "believe the survivor," and creating a pervasive campus climate of gender-bias that presumes accused males are "perpetrators" and female accusers are "survivors" and victims," and that bolsters student misconceptions about what constitutes sexual assault and consent (a misconception that motivated Jane Roe's accusations in John's case);

(b)     failing to take reasonable care in selecting, training, and supervising competent and impartial investigators, and Hearing and Appellate Panel members;

(c)     subjecting John to an incompetent, gender-biased process in the investigation and adjudication of his case, where both the investigator and Hearing Panel assumed Jane's credibility and disbelieved John in this "he said, she said" case solely on the basis of Jane's word and a handful of cherry-picked text and Facebook messages provided by Jane, and using the absence of text messages on certain details against John but not against Jane;

74

(d)     subjecting John to an incompetent appeals process, where the Appellate Panel found John responsible for a conduct violation as to which he had no advance notice, for which he was never charged, as to which neither the investigator nor Hearing Panel found him responsible, and which did not even exist in the Sexual Misconduct Policy at that time.

395.    As a direct, proximate, and foreseeable consequence of the foregoing, John has suffered physical harm, including severe emotional distress, which includes symptoms of depression, social anxiety, loss of concentration and focus, and feelings of hopelessness. He is no longer able to sleep through the night, and is in a perpetual state of anxiety and physical and emotional exhaustion.  He has suffered from suicidal ideation.

396.    A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

397.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

### COUNT V
### (Unfair or Deceptive Trade Practices)

398.    The foregoing allegations are incorporated by reference as if fully set forth herein.

399.    The Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, *et seq*.) provides comprehensive protection for consumers, borrowers, and businessmen against fraud, unfair methods of competition, and unfair or deceptive practices in the conduct of trade or business.

400.    Illinois Courts have identified four elements that give rise to a private cause of action under the Act: (1) a deceptive act or practice by the defendant; (2) the defendant intended the plaintiff to rely on that deception; (3) the deception occurred in the course of conduct

involving trade or commerce; and, (4) actual damages to the plaintiff proximately caused by the deception. (*Id.*).

401.    The terms of the Act are liberally construed and a defendant's good faith in making a representation to another is irrelevant.

402.    Northwestern has engaged in the following acts or practices that are deceptive or misleading in a material respect, or committed deceptive acts or practices, which were aimed at the consumer public at large, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances: (a) by causing John as well as potential and current consumers of Northwestern's educational services to believe that Northwestern would comply with its obligations, standards, policies, and procedures, printed copies of which were provided to John and are available to potential and current consumers of Northwestern's educational services on Northwestern's Internet Website; and (b) by causing John as well as potential and current consumers of Northwestern's educational services to believe that if they paid tuition and fees to Northwestern, that Northwestern would uphold its obligations, covenants and warranties to them described in its policies.

403.    Northwestern had no intention of following its own standards, policies, and procedures with respect to John as a male accused of sexual assault when it found John responsible for sexual assault in spite of Jane's unreliable account of the events at issue and objective evidence to the contrary in text and Facebook messages, and when Northwestern intentionally failed to conduct a fair and impartial investigation and adjudication of John's case.

404.    At the beginning of the 2016-2017 academic year, the University issued a Revised Policy on Sexual Misconduct. The Revised Policy amended the voluntary consent provision by eliminating the term "undue pressure" and defining the term "coercion" as "severe or persistent

pressure causing fear of significant consequences from respondent if one does not engage in sexual activity . . . ." (Ex. D at 3).

405.     Northwestern's stated policies and procedures, together with its violations thereof with respect to John as a male accused of sexual assault, and the change in the Revised Policy almost immediately subsequent to him being found responsible for sexual misconduct, demonstrate Northwestern's deceptive practices with respect to John and with respect to prospective and current Northwestern male students accused of sexual assault at Northwestern.

406.     Northwestern's deceptive practices have had a broader impact on consumers at large, in that at all relevant times alleged in this Complaint Northwestern advertised to potential consumers of its educational services through its Internet Website and printed materials that Northwestern provided an environment and judicial processes free from gender bias against male students accused of sexual misconduct.

407.     Based on the foregoing facts and circumstances, Northwestern engaged in unfair or deceptive trade practices.

408.     As a direct, proximate, and foreseeable consequence of the foregoing, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

## COUNT VI
### (Defamation Per Se)

409.     The foregoing allegations are incorporated by reference as if fully set forth herein.

77

410.    In March 2016, the investigator issued a Report in which she concluded that Jane Roe's version of events was "credible," and that John had committed a forcible sexual assault. The Hearing Panel affirmed the investigator's finding.

411.    In May 2016, the Appellate Panel rejected the investigator's and Hearing Panel's finding of forcible sexual assault ("physical force was not used").

412.    During the period from approximately March 2017 through June 2017, the University provided information in John's disciplinary record to third parties, notably admissions officers at colleges and universities to which John applied as a prospective transfer student.

413.    Upon information and belief, the disciplinary information that the University provided to these third parties included the investigator's and Hearing Panel's discredited finding that John had forcibly sexually assaulted Jane Roe, despite the University's knowledge that the Appellate Panel in John's case had determined that a forcible sexual assault had not occurred and was not supported in the factual record created by the investigator and Hearing Panel.

414.    Upon information and belief, the University also provided third parties, including admissions officers of prospective transfer schools, with the Appellate Panel's finding that John had sexually assaulted Jane Roe through "emotional and verbal coercion," despite the University's knowledge that (a) Jane had never alleged emotional and verbal coercion, (b) John had never been charged with that violation and had never received notice of it at any time during the investigation and hearing, (c) neither the investigator nor Hearing Panel found John responsible for emotional and verbal coercion, and (d) the term "emotional and verbal coercion" did not exist in the 2014-2015 Sexual Misconduct Policy's list of possible sexual misconduct violations.

415. The University published this inherently defamatory false information to third parties with reckless or negligent disregard of its falsity.

416. John was rejected by 11 schools to which he had applied, including schools where he had previously been accepted, on the basis of the false, defamatory information disseminated to the schools by Northwestern.

417. Illinois recognizes that certain statements are so egregious that they are considered defamatory and assumed to harm plaintiff's reputation. These include accusations of sexual assault or rape.

418. As a direct, proximate, and foreseeable consequence of the dissemination by the University of the false and defamatory statements from the investigators' Report, Hearing Panel's finding and Appellate Panel's finding, John has suffered damage to his reputation, emotional distress, humiliation, and embarrassment.

419. As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## JURY DEMAND

420. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Doe respectfully requests that this Honorable Court:

a. Declare that Northwestern breached its contract with John;

b. Grant injunctive relief ordering Northwestern to reverse and expunge its findings of responsibility and sanction from John's educational record;

c. Grant injunctive relief ordering Northwestern to provide a Dean's Statement that shall be made available to third parties upon John's request (such as educational institutions and

prospective employers) certifying that Northwestern has reversed and expunged the findings and sanction;

d. Award John compensatory damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of education and professional opportunities, loss of future career prospects, and other direct and consequential damages;

e. Award prejudgment interest;

f. Award attorney fees and costs pursuant to statutory or common law doctrines providing for such award; and

g. Grant such other and further relief that the Court deems just and proper.

Dated: September 12, 2017      Respectfully submitted,

                  JOHN DOE

                  By:*/s/* Jonathan M. Cyrluk         
                      One of his attorneys

Jonathan M. Cyrluk (ARDC No. 6210250)
 *Designated as Local Counsel*
Carpenter Lipps & Leland LLP
180 North LaSalle Street
Suite 2105
Chicago, IL 60601
Phone: (312) 777-4300
Email: cyrluk@carpenterlipps.com

Patricia M. Hamill
(Admission *Pro Hac Vice* Pending)
Jeannette M. Brian
(Admission *Pro Hac Vice* Pending)
CONRAD O'BRIEN PC
Centre Square, West Tower
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Phone: (215) 864-9600
Email: phamill@conradobrien.com
      jbrian@conradobrien.com